NATURAL GAS PIPELINE COMPANY OF AMERICA, et al., Appellants,

v.

Joseph H. POOL, et al., Appellees.

No. 07–99–0429–CV.

Court of Appeals of Texas, Amarillo.

Oct. 12, 2000.

Rehearing Overruled Nov. 21, 2000.

Jesse R. Pierce, Clements, O'Neill, Pierce, Nickens, & Wilson, Houston, Bruce M. Kramer, Lubbock, Maston C. Courtney, Hinkle, Kensley, Shanor & Martin, Edward H. Hill, Amarillo, Alan Wright, Haynes and Boone, Dallas, for appellant.

Joe L. Lovell, Lovell, Lovell & Newsom, Amarillo, James R. Lovell, Lovell & Lyle, Dumas, for appellee.

Before BOYD, C.J., and QUINN and JOHNSON, JJ.

JOHN T. BOYD, Chief Justice.

This dispute is between parties to a gas lease in which the lessors claim that the lease has terminated due to a cessation in production. Appellants Natural Gas Pipeline Company of America (NGPL), Mid-Con Gas Services Corp. (MidCon), and Chesapeake Panhandle Limited Partnership (Chesapeake) appeal from a judgment rendered against them in favor of appellees [1] that the subject gas lease terminated pursuant to the terms of the habendum clause of the lease and which awarded damages and attorney's fees.

---

1. Appellees are Joseph H. Pool, Individually and as Co–Executor of the Estate of Elizabeth Sneed Pool Robinett, deceased; Pamela E. Barnes, Co–Executor of the Estate of Elizabeth Sneed Pool Robinett, deceased; Dorothy Ann Kinney, Co–Executor of the Estate of Elizabeth Sneed Pool Robinett, deceased; Joseph Tyre Sneed III; Patricia Lomax; Anne Lomax Vickers; Delaware Royalty Company, Inc.; Donald O. Hildebrand and Susan D. Bass, Conservators of Cara Sneed Pyle; H.M. Sneed, III; Phillip Thompson, Trustee of the Georgie E. Thompson Grandchildren Trust; Vernon Denson, Guardian of Lillian Bond Denson; Arthur Talk; Sandra Rose, Individually and as Independent Executrix of the Estate of Georgie Beal Rose, deceased; the Susan S. Wilson Trust # 4100–01; and the Lynn A. Wilson Trust # 4100–02.

In 13 points, appellants claim that (1) the trial court erred in granting summary judgment that the lease terminated because of cessation of production; (2) they established the affirmative defense of laches as a matter of law; (3) they established the affirmative defense of revivor as a matter of law; (4) they established title by adverse possession as a matter of law; (5) the trial court erred in awarding damages for bad faith trespass since appellants' possession of the mineral estate following termination of the lease was permissive; (6) the trial court erred in admitting the deposition testimony of Don Darsey; (7) the evidence was legally and factually insufficient to support the finding of fraud and the award of exemplary damages; (8) the evidence was legally and factually insufficient to support the finding that appellants produced gas in bad faith; the trial court erred in awarding (9) damages for the four-year period preceding the filing of the lawsuit; (10) attorney's fees; (11) prejudgment interest; (12) a judgment jointly and severally for actual damages; and (13) to appellees the well and lease equipment. For the reasons set forth below, we modify the judgment and, as modified, affirm it.

On January 5, 1937, J.T. Sneed, Jr. and Elizabeth Sneed Pool, each individually and as independent executors of the estate of Zella Sneed, deceased, executed a gas mining lease in favor of Texoma Natural Gas Company covering Section 8, Section 9, the southwest quarter of Section 7, and 200 acres of the southeast portion of Section 6 in Block B–12, D & P Ry. Co. Survey, Moore County, Texas. The lease was to remain in force subject to other provisions in the lease "pending the commencement and continuation of drilling operations on said land as hereinafter provided, and as long thereafter as natural gas is produced and marketed from any well on said land." Appellants are successors-in-interest to Texoma Natural Gas Company.

Two gas wells, the J.T. Sneed SN11 and the J.T. Sneed SN15, were drilled on portions of the land covered by the lease or on lands consolidated therewith, and there is apparently no dispute that the initial gas production was timely obtained. A third well was drilled on the lease in 1996. On May 20, 1998, successors-in-interest to the lessors of the lease filed this lawsuit alleging that there was no production on the lease from either the SN11 or the SN15 wells during the following periods: August 1959, July—August 1960, June—July 1961, June—October 1963, July—August 1964, and June 1969.[2] They sought a decree that the lease terminated automatically by its own terms as well as damages for conversion. In addition to denying the allegations and asserting various counterclaims, appellees also asserted affirmative defenses of the statute of limitations, title by adverse possession, ratification, revivor, estoppel, quasi estoppel, laches and waiver.

In its February 16, 1999 order granting partial summary judgment, the trial court determined that the lease "has lapsed and ended pursuant to the terms of its habendum clause due to one or more cessations of production from said land." The case subsequently went to trial on the remaining issues, including appellants' affirmative defenses. The jury returned a verdict that appellants had acted in bad faith in producing gas from the lease after August 1964, such gas was produced as a result of fraud, the failure to produce gas was not excused, appellants did not acquire title by adverse possession, and the lease was not revived. The jury awarded exemplary damages as well as attorney's fees. The trial court entered judgment on the jury's verdict.

■ In their first issue, appellants claim that the trial court erred in granting its partial summary judgment that the lease terminated because of a cessation in production. Appellees had moved for partial summary judgment under Texas Rule of

---

**2.** The complaint was subsequently amended to assert a claim for trespass. Claims for

breach of the implied covenants of the lease were dropped.

Civil Procedure 166a(a) and (i). To be entitled to summary judgment, the moving party must show that there is no genuine issue of material fact as to the essential elements of the cause of action. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *Abraham Inv. Co. v.. Payne Ranch, Inc.,* 968 S.W.2d 518, 523 (Tex. App.—Amarillo 1998, pet denied). To attack a "no-evidence" summary judgment motion, the non-movant must show that he produced more than a scintilla of probative evidence to raise a fact issue on the material questions presented. *Kimber v. Sideris,* 8 S.W.3d 672, 675–76 (Tex.App.—Amarillo 1999, no pet.). A "no-evidence" summary judgment motion may be made only with respect to claims on which the adverse party would have the burden of proof. Tex.R. Civ. P. 166a(i).

To establish the lack of production during the referenced periods, appellees attached certified copies of Texas Railroad Commission production records for the SN11 and SN15 wells to their motion for summary judgment. Copies of those records were attached for 1962, 1963, 1964, 1965 and 1969. According to the terms of this particular lease, production anywhere on the land covered by the lease perpetuated the entire lease. Therefore, it is only time periods when both wells failed to produce that are relevant to our discussion of this issue. Those time periods for which records were provided are June—October 1963, July and August 1964, and June 1969. Appellees also attached a copy of the lease to their motion.

▇▇▇▇ Appellants argue it was appellees' burden to prove that there were no wells other than the SN11 and the SN15 producing on the lease during those time periods, and that they failed to do so. Only genuine issues of material fact preclude summary judgment. *Sasser v. Dantex Oil & Gas, Inc.,* 906 S.W.2d 599, 604 (Tex.App.—San Antonio 1995, writ de-

nied). Where the summary judgment evidence raises no more than a surmise or suspicion of a fact issue, no genuine issue of material fact exists to defeat summary judgment. *Booth v. Cathey,* 893 S.W.2d 715, 719 (Tex.App.—Texarkana), *rev'd in part on other grounds,* 900 S.W.2d 339 (Tex.1995). A fact is established as a matter of law if ordinary minds cannot differ as to the conclusion to be drawn from the evidence. *See Triton Oil & Gas Corp. v. Marine Contractors and Supply,* Inc., 644 S.W.2d 443, 446 (Tex.1982); *Ellert v. Lutz,* 930 S.W.2d 152, 155 (Tex.App.—Dallas 1996, no writ). Summary judgment should not be granted when the cause of action depends on proof of facts not ordinarily subject to absolute verification or denial, *e.g.,* intent, reliance, reasonable care or uncertainty. *Villacana v. Campbell,* 929 S.W.2d 69, 73 (Tex.App.—Corpus Christi 1996, writ denied).

It is true that a summary judgment motion must stand on its own merits, and the non-movant has no burden to respond to the motion. *Rhone–Poulenc, Inc. v. Steel,* 997 S.W.2d 217, 222–23 (Tex.1999). However, appellants did respond to this motion. The affidavit of Bobby Montgomery, operations manager for NGPL, states that "one or more of the wells on the lease sought to be terminated have been continually produced without interruption since July 1969." If there had been a well other than the SN11 and SN15 producing on the lease during the critical time periods for which production records were not provided by appellees, that fact should have been easily controvertible by Montgomery through records of NGPL or the Railroad Commission. We do not believe that reasonable minds would differ as to the conclusion to be drawn from the evidence that was before the court, *i.e.,* that there were only two producing wells on the lease during the time periods for which cessations of production were established.[3]

---

3. Appellants recite in their appellate brief that the SN11 and SN15 wells were drilled on the lease in the late 1930s and another well was

drilled on the lease in 1996. Appellants do not assert that any other wells ever existed on the lease.

■ Appellants also rely on the argument that appellees must show there was no production in paying quantities, and in order to do so, must prove that production did not yield a profit after deducting operating and marketing costs, and that a prudent operator would continue to operate the well for a profit and not speculation. *See Pshigoda v. Texaco, Inc.*, 703 S.W.2d 416, 418 (Tex.App.—Amarillo 1986, writ ref'd n.r.e.). It is the rule that an oil or gas lease may be kept alive after the primary term only by production in paying quantities or a savings clause, such as a shut-in royalty clause. continuous operations clause, drilling operations clause, etc. *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 431 (Tex.App.—Amarillo 1993, no writ); *Shown v. Getty Oil Co.*, 645 S.W.2d 555, 559 (Tex.App.—San Antonio 1982, writ ref'd). In situations where there are periods of no gas production and no "savings clauses," the courts imply a "temporary cessation" doctrine, which requires that the cessation must be "due to a sudden stoppage of the well or some mechanical breakdown of the equipment used in connection therewith, or the like," and production must be resumed within "a reasonable time." *Watson v. Rochmill*, 137 Tex. 565, 155 S.W.2d 783, 785 (1941). The burden is upon a lessee to prove that a cessation of production fell within the temporary cessation doctrine. *Bradley v. Avery*, 746 S.W.2d 341, 343 (Tex.App.—Austin 1988, no writ). Furthermore, no analysis of whether production was in paying quantities is necessary if the evidence establishes no production at all. *Bachler v. Rosenthal*, 798 S.W.2d 646, 650 (Tex.App.—Austin 1990, writ denied).

■ Appellants attempted to supplement their summary judgment evidence with the affidavit of Jerald B. Post, who was Area Superintendent of Gas Measurement for NGPL for the years August 1958 through March 1986.[4] Post averred that the only reasons why production from a well in the West Panhandle Field may not have been reported to the Railroad Commission during that time period were for workovers, routine maintenance, because of an order of the Railroad Commission relating to overproduction, gathering system problems, and excessive line pressure. He also offered the conclusory statement that no well that was either shut in or unable to produce was ignored by NGPL, but that NGPL attempted at the first opportunity to restore production and diligently continued its efforts until production was restored. Here, it is undisputed that there is no savings clause in the lease to prevent termination.[5] For a cessation to be temporary, not only must it be due to some mechanical breakdown or something similar, but production must resume within a reasonable time. What constitutes a reasonable time depends on the facts presented. *See Watson*, 155 S.W.2d at 784; *Cobb v. Natural Gas Pipeline Co. of America*, 897 F.2d 1307, 1309 (5th Cir.1990).

■ Assuming arguendo, that the summary judgment proof presented by appellants is sufficient to establish that the reason for the stoppage of production had to be a mechanical breakdown or something similar, no specific facts were offered by appellants with respect to the wells on the lease to show, based on the particular problem encountered in those wells and the efforts employed by appellants to solve those problems, that production was restored in a reasonable time. Since there

---

4. Although the record does not show whether the trial court granted appellants' motion for leave to supplement their evidence opposing the partial summary judgment, the trial court's order granting the partial summary judgment refers to the court having considered the motion for leave to supplement. Thus, we will assume for the purposes of our

discussion that this evidence was considered by the trial court.

5. There is a force majeure clause in the lease, but there was no contention that this provision would save the lease under the facts presented.

was no evidence before the trial court on this issue, we do not believe that appellants met their burden to show a genuine fact issue, and the trial court did not err in granting summary judgment with respect to termination of the lease. While some of appellants' summary judgment proof was devoted to their affirmative defenses, the trial court did not preclude appellants from asserting those defenses at trial. We overrule appellants' first issue.

Appellants claim in their second issue that they established the affirmative defense of laches as a matter of law and that the jury's failure to so find was against the great weight and preponderance of the evidence. To prove laches, it must be shown that there was an unreasonable delay in asserting a legal or equitable right and a good faith change of position by another to his detriment because of the delay. *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex. 1989); City *of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex.1964); *Campbell v. Pirtle*, 790 S.W.2d 372, 375 (Tex.App.—Amarillo 1990, no writ). If the delay impairs the defendant's ability to defend against the claim or ascertain the true facts, then the claim should be barred for laches. *De Benavides v. Warren*, 674 S.W.2d 353, 362 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.); *see also Altech Controls Corp. v. E.I.L. Instruments, Inc.*, 33 F.Supp.2d 546, 553 (S.D.Tex.1998).

Appellants contend that due to the lapse of between 29 years (assuming the lease terminated at the most recent cessation proved by appellees in 1969) and 35 years (assuming the lease terminated at the earliest cessation proved by appellees in 1963) since the wells experienced cessations in production, they are unable to locate documents and witnesses to defend against the claims of appellees. Without these resources, appellants argue, they were unable to identify the causes of the interruptions in gas production and establish that they were merely temporary cessations. Conversely, appellees argue that the equi-

table defense of laches is not available as a matter of law in an action based on a legal right. They also contend that the information available to appellees did not provide them with the reasons for the cessations in production, so they had no knowledge that the lease terminated until shortly prior to filing their suit.

We do not agree that the defense of laches is unavailable as a matter of law in any action based on a legal right, since both the supreme court and various courts of appeal have found otherwise. *City of Fort Worth*, 388 S.W.2d at 403; *Preston Tower Condominium Assn. v. S.B. Realty, Inc.*, 685 S.W.2d 98, 104 (Tex.App.—Dallas 1985, no writ); *Smith v. Smith*, 681 S.W.2d 793, 796 (Tex.App.—Houston [14th Dist.] 1984, no writ); *De Benavides*, 674 S.W.2d at 362. However, it has been held by the supreme court that "[l]aches is not a defense in a trespass to try title suit where the plaintiff's right is based on legal title." *Rogers*, 772 S.W.2d at 80; *see also Smoot v. Woods*, 363 S.W.2d 798, 802 (Tex.Civ. App.—Fort Worth 1962, writ ref'd n.r.e.).

In *Rogers*, the assignors of a portion of an oil and gas lease brought a trespass to try title action to recover possession of a working interest in the lease. The *Rogers* decision was issued after the opinion of the San Antonio Court of Appeals in *De Benavides*, which is cited to us by appellants as support for their argument that laches is a viable defense to these claims. Indeed, the San Antonio Court of Appeals has more recently concluded that "laches is not a defense to a claim of title." *Eland Energy, Inc. v. Rowden Oil & Gas, Inc.*, 914 S.W.2d 179, 188 (Tex.App.—San Antonio 1995, writ denied). The *Eland* case also involved a suit for declaratory judgment to clear title to an oil and gas lease. Because this is an action in which a claim for title is made, laches is not available and we must overrule appellants' second issue.

In their third issue, appellants claim that they established the affirmative

defense of revivor as a matter of law and they were entitled to judgment notwithstanding the verdict on that issue. Revivor of a lease has been recognized by "the subsequent execution of a formal document even to a third person which expressly recognizes in clear language the validity of a lifeless deed or lease...." *See Westbrook v. Atlantic Richfield Co.,* 502 S.W.2d 551, 555–56 (Tex.1973) (quoting *Hastings v. Pichinson,* 370 S.W.2d 1, 4 (Tex.Civ.App.—San Antonio 1963, no writ)); *Exploracion De La Estrella Soloataria Incorporacion v. Birdwell,* 858 S.W.2d 549, 554 (Tex.App.—Eastland 1993, no writ). Appellants contend that by execution of division orders between 1972 and 1995, appellees recognized the validity of the subject lease. However, some courts have opined that, in the absence of an express grant in the division order, a terminated oil and gas lease may be revived by the execution of division orders only if the lessee has detrimentally relied on them. *Exploracion De La Estrella,* 858 S.W.2d at 554; *Bradley,* 746 S.W.2d at 344. We agree with that reasoning.

▉ To determine if the jury erred in finding that the lease was not revived, which was an adverse finding on an issue upon which appellants had the burden of proof, we must examine the record for evidence that supports the finding, ignoring any evidence to the contrary. If there is no evidence to support the finding, we must determine if the opposite proposition was established as a matter of law. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983); *Raw Hide Oil & Gas, Inc. v. Maxus Exploration. Co.,* 766 S.W.2d 264, 275–76 (Tex.App.—Amarillo 1988, writ denied). The division orders do not contain any express grant of the gas lease. Therefore, we must examine the record to see if there is any evidence to support the proposition that appellants did not detrimentally rely on the division order.

There was evidence that a third well was drilled on the property in 1996, which was subsequent to the execution of some of the division orders, and that appellants would not have drilled the well if appellees had refused to sign the division orders, because they were claiming that the lease was terminated. However, there was also testimony from Don Darsey, a former employee of NGPL, that NGPL management was aware that some of the leases in the Texas Panhandle might have terminated for a failure to produce. Darsey stated that he had seen records indicating that some wells were shut in and that the demand for gas was less in the summer months, which is primarily when the subject wells failed to produce. Darsey testified that there were discussions whether to take renewal leases or do nothing. Although he could not say that the subject lease was one of the leases about which these discussions took place, the jury could reasonably have inferred that NGPL was aware that the lease had terminated and the lease was one of those discussed. There was also testimony from Bobby Montgomery, an operations manager for KN Energy which now owns NGPL, that they did not rely upon division orders in making decisions affecting daily operations on the lease. Thus, there is some evidence that appellants did not rely on the division orders in deciding to drill a new well. Because the evidence is sufficient to sustain the jury finding, we overrule appellants' third issue.

In their fourth issue, appellants claim that they established adverse possession as a matter of law, and that the jury's failure to so find was against the great weight and preponderance of the evidence. The evidence is undisputed that appellants or their predecessors have possessed the lease since 1937 and produced and marketed gas from it. There was testimony that appellants have paid the ad valorem taxes on the ⅞ working interest, maintained signs on the lease, filed reports with respect to the lease, and sent employees to the property. Appellants conducted activities in accordance with the lease as if it was in full force and effect. The evidence is also undisputed that appellees never

gave any indication to appellants that they considered the lease to have terminated until letters were sent to appellants in January 1998.

Appellants argue that if the lease terminated due to a cessation in production, then appellants' fee simple determinable estate in the minerals automatically terminated and appellants became trespassers. Appellants assert that once they became trespassers, their possession of the property was automatically hostile. Alternatively, appellants assert that in the event they were required to repudiate the lease, actual notice is not required but may be inferred.

■ Section 16.021 of the Texas Civil Practice and Remedies Code defines adverse possession as "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." Tex. Civ. Prac. & Rem.Code Ann. § 16.021 (Vernon 1986). Because the original possession of the property by appellants was not only permissive, but also consistent with appellees' concurrent interest in the property, adverse possession cannot be established unless notice of the hostile nature of the possession or repudiation of appellees' title is clearly manifested. *Killough v. Hinds,* 161 Tex. 178, 338 S.W.2d 707, 711 (1960); *Wright v. Wallace,* 700 S.W.2d 269, 271 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Hunt Oil Co. v. Moore,* 656 S.W.2d 634, 641 (Tex.App.—Tyler 1983, writ ref'd n.r.e.). There is no evidence in the record of any actions of appellants that were ever inconsistent with their permissive possession of the property in accordance with the terms of the lease so as to provide any actual repudiation of appellees' title.

■ Under the law, an oil and gas lessor has no duty to notify the lessee that he considers the lease to have terminated prior to filing suit. *See Watson,* 155 S.W.2d at 785. When the provisions of the habendum clause are not met, the lease reverts without the necessity of re-entry, declaration of forfeiture, or legal action. *Kincaid v. Gulf Oil Corp.,* 675 S.W.2d 250, 255 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). In fact, appellants should have had all the information available to them that was necessary to determine whether the lease had terminated at the time that the cessations occurred.

■ Appellants argue that if they became trespassers after termination of the lease, then their possession of the property after that time could not have been permissive, and they therefore met the requirements of possessing adversely. Entering a property without consent is not necessarily the same as claiming ownership of the property by that entry. While appellants may have become trespassers upon termination of the lease, that fact does not abrogate the requirement of notice of repudiation so as to establish adverse possession of the mineral interest in the property. In *Hunt Oil Co.,* in which the plaintiff sued Hunt Oil Company seeking to have a lease declared terminated, the court said:

> Upon execution of the Hamilton–Hunt lease on May 15, 1961, Hunt acquired constructive possession of the leasehold estate in Hamilton's one-tenth mineral interest. Such possession being in recognition of Hamilton's title, Hunt could not make it a hostile holding without a repudiation of Hamilton's title, evidenced by acts or declarations clearly manifesting such intention. [Citations omitted.] There is no indication in the record that Hunt intended to repudiate their recognition of Hamilton's title until after this suit was filed.

*Hunt Oil Co.,* 656 S.W.2d at 641. These words are similarly applicable to the case before us.

Appellants cite *Tex–Wis Co. v. Johnson,* 534 S.W.2d 895 (Tex.1976), to support their proposition that long-continued possession under a claim of ownership and non-assertion of a claim by the titleholder are facts from which notice of repudiation may be

inferred. However, the holding in that case requires that the adverse possession be inconsistent with the existence of title in any others. *Id.* at 899; *see also Thedford v. Union Oil Co. of California*, 3 S.W.3d 609, 612 (Tex.App.—Dallas 1999, pet. denied). As we have stated, no act of appellants has been shown to be inconsistent with the rights and interests to which each party was entitled had the lease remained in effect through continuous production. Therefore, there was nothing to put appellees on notice that appellants were claiming to own an interest adverse to appellees. Appellants' fourth issue is overruled.

■ Appellants claim in their fifth issue that appellees are not entitled to damages for bad faith trespass because appellants' possession of the mineral estate following the termination of the lease was permissive until such time as appellees chose to assert a claim that the lease had terminated. Appellants analogize this situation to one of landlord and tenant where the tenant holds over beyond the term of the lease, and the landlord has the option to treat the tenant as either a trespasser or a holdover tenant (or occupant at sufferance). Under this analysis, the acceptance of rental payments by the landlord operates as an election to continue the prior tenancy relationship. Appellants argue that if the lease terminated, their continued possession had to be either permissive or adverse; it could not be both. If it was permissive, then there could be no bad faith trespass.

■ When a lessee of mineral rights enters the land after termination of the lease and without consent of the lessor, he is liable for injury resulting from that unlawful entry. *Byrom v. Pendley*, 717 S.W.2d 602, 605 (Tex.1986). By definition, if the entry is permissive, then there is no trespass. Silence on the part of the lessor, however, does not necessarily make the entry onto the mineral lease permissive. *See Ladd Petroleum Corp. v. Eagle Oil & Gas Co.*, 695 S.W.2d 99, 109 (Tex.App.—

Fort Worth 1985, writ ref'd n.r.e.). Good faith, as it applies to a trespasser under a mineral lease is not determined by whether the entry is permissive, but by the belief of the one who enters that he had the right to enter and develop the minerals under the lease, and the damages for which a good faith trespasser is liable are limited to the value of the minerals removed, less drilling and operating costs. *Hunt v. HNG Oil Co.*, 791 S.W.2d 191, 193 (Tex.App.—Corpus Christi 1990, writ denied).

■ Moreover, the nonpermissive entry which constitutes trespass does not automatically make the entry and possession adverse within the meaning of the statutory requirements to acquire title by adverse possession which, as we have previously discussed, requires notice of repudiation as one element. Similarly, the holdover tenancy rules described by appellants with respect to landlord/tenant relationships are not necessarily applicable to the relationship of mineral lessor/lessee. In Texas, an oil and gas lease is tantamount to a sale of real property. *Helton v. Kimbell*, 621 S.W.2d 675, 677 (Tex. App.—Fort Worth 1981, no writ); *Allied Chemical Corp. v. G.E. Kadane & Sons*, 373 S.W.2d 778, 780 (Tex.Civ.App.—Eastland 1963, no writ). Under the authorities we have discussed, the analogy made by appellants is not applicable. Issue number five is overruled.

■ In their sixth issue, appellants argue that the trial court erred in admitting the deposition testimony of Don Darsey because it was hearsay and irrelevant. Darsey was a former employee of NGPL who had worked as a corporate litigation representative for NGPL. He later became employed as a consultant for James R. Lovell, one of the attorneys representing some of the appellees. The deposition that was introduced at trial was taken in a case against the same defendants pending in federal court with respect to cessations of production on another lease or leases. Ap-

pellants claim that the deposition of Darsey was hearsay because appellees did not meet their burden of showing that Darsey was unavailable as a witness at trial.

■■■ Texas Rule of Evidence 804(b) provides in relevant part:

(b) **Hearsay Exceptions.** The following are not excluded if the declarant is unavailable as a witness:

(1) *Former Testimony.* In civil cases, testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in the course of another proceeding, if the party against whom the testimony is now offered, or a person with a similar interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

Situations where a person is "unavailable as a witness" include when he is exempt by ruling of the court on the ground of privilege, refuses to testify concerning the subject matter despite an order to do so, testifies to a lack of memory, is unable to be present due to death or an existing illness, or the proponent of the statement is unable to procure the testimony by process or other reasonable means. Tex.R. Evid. 804(a). A witness is also unavailable if he has been kept away from trial by an adverse party. *Hall v. White,* 525 S.W.2d 860, 862 (Tex.1975).

Darsey's affidavit was presented to the trial court at the time the court was asked to rule upon the introduction of his deposition. In his affidavit, Darsey avers that he had been requested to appear for trial and testify concerning his testimony taken by deposition on September 10, 1998, in cause number 2–98–CV–012 consolidated with cause number 2–98–CV–106, *Phillip Thompson, et al. v. Natural Gas Pipeline Company of America, et al.* in the U.S. District Court for the Northern District of Texas. He further states that he has been sued by NGPL in Harris County and that, on the advice of his attorney, he is declining to testify at the trial in the case at bar. At the time of the hearing on the admissi-

bility of his prior testimony, appellants' counsel informed the trial court that in the suit, NGPL sought the recovery of damages as well as an injunction to prevent him from disclosing privileged and confidential information. However, appellants contend, Darsey was still free to testify at trial about any matter that was not privileged. They also claim that because he was deposed in the case at bar, he should be made to testify in this case.

■■■ We believe Darsey's refusal to testify on the advice of his counsel made the witness "unavailable" for purposes of this trial. There is nothing in the record to show that his refusal to testify on the advice of his counsel was not true. Moreover, that advice was, at least, indirectly necessitated by the act of appellants in suing Darsey. Additionally, although appellants claim that Darsey was deposed in this proceeding, we note the deposition was taken in the Harris County case in which Darsey was sued by NGPL, although it was agreed by the parties that it could be used in any of the pending Carson or Moore County lawsuits. The existence of a deposition in yet another proceeding does not of itself make the witness "available" for trial in this proceeding. Counsel for the same defendants as in this case posed all of the questions to Darsey in the deposition taken in the federal court proceeding, so there is no question but what appellants had a similarity of interests and the opportunity to develop the testimony by examination. We believe that the requirements of the rule have been met, and the deposition was properly admitted.

■■■ Appellants further contend that the testimony of Darsey is not relevant and inadmissible because its probative value, if any, was outweighed by the danger of unfair prejudice. Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R.

**632**

Evid. 401. Although relevant, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Tex.R. Evid. 403.

Appellants claim that the testimony is not relevant because although Darsey testified that he saw some records in the 1980's which showed cessations of production from some wells in the West Panhandle Field and that NGPL management considered attempting to obtain ratifications of those leases, he could not identify any particular leases for which he saw such records nor could he state that they included the lease involved in this particular lawsuit. Additionally, and alternatively, appellants also contend that the probative value of this evidence was slight and must have been extremely prejudicial inasmuch as it must have been the basis for the jury's bad faith finding.

■ The relevancy test is satisfied if there is some logical connection either directly or by inference between the fact offered and to be proved. *Service Lloyds Ins. Co. v. Martin*, 855 S.W.2d 816, 822 (Tex.App.—Dallas 1993, no writ). Reviewing courts generally leave to the trial court's discretion questions of relevancy and the weighing of the probity of evidence versus its prejudicial nature. *Miles v. Ford Motor Co.*, 922 S.W.2d 572, 596 (Tex.App.—Texarkana 1996), *rev'd in part on other grounds*, 967 S.W.2d 377 (Tex. 1998). Because reasonable minds may disagree whether in common experience a particular inference is available from evidence, an appellate court should not disturb the trial court's ruling on relevancy as long as it is within the zone of reasonable disagreement. *Stern v. State*, 922 S.W.2d 282, 287 (Tex.App.—Fort Worth 1996, pet. ref'd). We do not believe that the trial court's admissibility of this testimony falls outside the zone of reasonable disagreement either with respect to its relevancy or as to the balancing of its probative value versus its prejudicial nature. Appellants' sixth issue is overruled.

■ In their seventh issue, appellants contend that the evidence was legally and factually insufficient to support the finding of fraud and the award of exemplary damages. The jury was asked in Question 4 whether they found by clear and convincing evidence that any one or more of the defendants produced gas after August 1964 as a result of fraud, to which the jury responded "yes" as to all defendants. In Question 5, the jury was asked what sum of money should be assessed against each defendant as exemplary damages, if any, for the conduct found in response to Question 4. The jury awarded $1.2 million against each defendant.

■ To determine the legal sufficiency of the evidence, we must review the entire record for any probative evidence, which when viewed in its most favorable light supports the judgment while disregarding all evidence to the contrary. *Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). To determine the factual sufficiency of the evidence, we must examine the entire record to determine if there is some probative evidence to support the finding and whether, in light of all the evidence, the finding is manifestly unjust. *Garza*, 395 S.W.2d at 823; *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951).

■ Fraud requires a material representation which was false and was known to be false when made or which was asserted without knowledge of its truth. The material representation must have been intended to be acted upon and must have been acted upon to another's detriment. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex.1998); *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998). A defendant's silence can be equivalent to a false representation if the circumstances impose on a defendant a duty to speak. *Spoljaric v. Percival Tours, Inc.*, 708

S.W.2d 432, 435 (Tex.1986). However, there is generally no duty of disclosure without evidence of a confidential or fiduciary relationship. *Insurance Co. of North America v. Morris,* 981 S.W.2d 667, 674 (Tex.1998).

There is no evidence in the record that appellees did not receive run statements showing production from the wells (or the lack thereof) for each month. In fact, there is evidence that one appellee did receive such information. There is also evidence that appellants provided this production information to the Texas Railroad Commission and that the records of the Texas Railroad Commission are available to the public. Additionally, there is testimony that at least one appellee was contacted in 1993 by Max Banks, an employee of West Panhandle Field Resources, which is a company that "helps royalty owners to ... find out whether oil companies have done proper by producing their wells," with regard to a possible termination of the lease due to a lack of production. Robert Brandt, another employee of West Panhandle Field Resources, testified that the records he had with respect to this lease at the time the lawsuit was filed in 1998 were the records of the Texas Railroad Commission and Dwight's Energy Service, a commercial service.

Moreover, there is no testimony that appellees were not provided with information that they requested from appellants. In fact, there is documentary evidence that NGPL provided one appellee with production information requested by letter, and provided information to a royalty owner on another lease as to the reason for cessations of production during a certain period. There is also no testimony that appellants or any of their employees ever made a decision or established a policy to withhold information from appellees.

Appellees argue that appellants should have disclosed to them the causes of the cessations of production and that the cessations terminated the lease. Instead, they assert, NGPL management made the informed decision to withhold their knowledge that the lease had terminated. By requesting appellees to sign division orders, appellees claim that appellants made the false representation that there was a valid lease. Appellees also claim that a non-party, MC Panhandle, tried to induce appellee Joseph H. Pool to ratify the lease without disclosing the fact the lease had lapsed.

■ As we have previously stated, absent a confidential or fiduciary relationship, there is generally no duty to disclose. Texas law has not recognized a fiduciary relationship between a lessee and royalty owners. *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 888 (Tex. 1998). In *Harrison v. Bass Enterprises Production Co.,* 888 S.W.2d 532 (Tex. App.—Corpus Christi 1994, no writ), a non-participating royalty owner claimed fraudulent concealment against the well operator in his action to recover unpaid royalties because the operator did not inform him that he had a cause of action against the operator. The court found that no relationship of trust was demonstrated such as to create a duty on the part of the operator to disclose the existence of a cause of action. *Id.* at 537. Moreover, the court said there was evidence of a report in the royalty owner's files showing continuous production which was enough to put him on notice that his interest had been perpetuated by production. Also, an inspection of his own records would have shown that he was receiving no royalty payments. A non-participating royalty owner is charged with the duty of protecting his own interests. *Id.* at 538.

In another case, *Shivers v. Texaco Exploration and Production, Inc.,* 965 S.W.2d 727 (Tex.App.—Texarkana 1998, pet. denied), the royalty owners claimed that Texaco failed to inform them of tax credits that were available for natural gas produced from a "tight formation." Texaco argued that it had no duty to inform the royalty owners of the credit and that

through reasonable diligence, the owners could have discovered the information necessary to claim the credit. Agreeing, the appellate court noted that a taxpayer is charged with knowledge of the tax code and that the royalty owners had actual knowledge of the production information from the royalty checks. *Id.* at 735. Additionally, although Railroad Commission records may not necessarily serve as constructive notice in every situation, they are publicly available and a ready source of information. *HECI Exploration Co.*, 982 S.W.2d at 887.

■ Appellees in the case at bar had run statements received from appellants and the Texas Railroad Commission records available to them to show that there were periods when the wells did not produce. There was no affirmative duty on the part of appellants to render any opinion to appellees as to whether the lease had terminated by those cessations. We know of no requirement under the law that appellants furnish a reason for those cessations to appellees with the run tickets, and there is no evidence that appellees ever requested that information from appellants. Additionally, we do not know how any attempt to obtain a ratification of a lease in exchange for an increased royalty constituted fraud.[6] This attempted ratification occurred in 1997 after that particular appellee had already been contacted twice by other persons about bringing lawsuits against appellants because that lease or other leases may have terminated.[7] If anything, that should have been further indication to appellees that there was a possibility that the lease had terminated, particularly if, as appellees contend, the increased royalty was offered on one lease but the ratification was requested to cover a number of additional leases. As stated in *Harrison,* a royalty owner is charged

with some duty to protect his own interests.

While appellees argue that the sending of division orders to them constituted a representation that the lease was valid, we note that they have also argued that their signing of division orders does not constitute any sort of ratification or revivor of the lease on their part. We have agreed with appellees on the revivor issue in this case. Similarly, we do not believe that the fact that appellants sent division orders to appellees for signature constitutes a fraudulent misrepresentation on the part of appellants absent some confidential or fiduciary relationship. Based on the authorities cited and the evidence in the record, we find no evidence to support the jury finding of fraud as it relates to the award of exemplary damages, and we modify the judgment to delete that award. Appellants' seventh issue is sustained.

■ In their eighth issue, appellants argue that the evidence was legally and factually insufficient to support the finding that they produced gas in bad faith. We have already set forth the standard for our review of these issues. Appellants contend that the only evidence of bad faith on their part was Darsey's testimony, in which he stated that he had seen documents in the 1980's indicating that some wells in the West Panhandle Field had not been produced due to being "shut-in on orders." Darsey also testified:

> Well, it was my understanding that shutting in a well for lack of market was not a valid reason for shutting the well in. We were up there at the time, trying to find some information on another lawsuit, and I think everyone that had any sense of responsibility in the company was well aware of the danger of the

---

6. The testimony is that the increased royalty was offered on a lease other than the subject lease. The record is unclear as to whether the request for ratification covered only the lease upon which the increased royalty was offered or other leases.

7. There is evidence that James R. Lovell had contacted Joseph H. Pool and his mother in 1990 about another lease and that Max Banks had contacted them in 1993 about leases held by appellants.

exposure that they had, perhaps losing most of their wells, and I thought it was pretty incriminating and dangerous information.

Darsey also attended some meetings where it was discussed as to whether to renew the leases or do nothing because it would be "like kicking a sleeping dog." Darsey could not testify that any of the information he saw pertained to the subject lease.

However, in addition to Darsey's testimony, the record contains Plaintiffs' Exhibit Nos. 68 and 69, which showed periods of nonproduction from a number of NGPL wells in Moore and Carson Counties. These exhibits indicated that most of those periods occurred during the summer months. There was also testimony that the market for gas was less in the summer. Bob Brandt, an employee of West Panhandle Field Resources who prepared the exhibits, testified that "... even when they were underproduced, they kept—they either shut the wells in or produced slightly in the summertime so they could overproduce heavily in the wintertime." Also before the jury was a 1960 letter sent by NGPL to some royalty owners on another lease in the West Panhandle Field, in which NGPL stated that "summer market for gas has declined to the point that it was necessary to shut in a number of its gas wells for periods of a month or more, ..." Looking at this evidence in its most favorable light to appellees and drawing reasonable inferences therefrom, the jury could have found that appellants had knowledge that the lease had terminated. Continuing entry onto the lease by a lessee who has no good faith belief in the existence of its lease constitutes bad faith trespass. We believe that there was sufficient evidence to uphold the jury finding on this issue. Appellants' eighth issue is overruled.

 Appellants contend by way of their ninth issue that appellees are not entitled to recover damages for the four-year period preceding the filing of the lawsuit. They argue that the two-year statute of limitations applies to actions for conversion. In response, appellees claim that their cause of action is for money had and received, which is a quasi-contractual action.[8] Appellees also contend that the four-year statute is applicable because of the jury finding on fraud. We have determined that the finding on fraud cannot stand, and there is thus no basis on that theory for application of a four-year statute of limitations.

 While it is true that a four-year limitation has been held applicable to an action for money had and received, *Amoco Production Company v. Smith*, 946 S.W.2d 162, 165 (Tex.App.—El Paso 1997, no writ), it is also true that such a cause of action is an equitable cause of action. *Acoustical Screens in Color, Inc. v. T.C. Lordon Co., Inc.*, 524 S.W.2d 346, 350 (Tex. Civ.App.—Dallas 1975, writ ref'd n.r.e.). Appellees have contended that appellants may not assert the defense of laches because it is not applicable in actions based on legal rights as opposed to equitable ones, and we have agreed with that argument as it applies to trespass to try title actions based on legal title. We do not believe that appellees may now assert that their action is really one in equity so as to be able to take advantage of an extended limitations period. The limitations period for actions based on trespass and conversion is two years. Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (Vernon Supp.2000). We also note that an issue with respect to the good faith of appellants in producing gas from the lease, which is an issue as to trespass, was submitted to the jury. For these reasons, appellants' ninth issue is sustained. Based upon the parties' stipulation as to the amount of gas produced from the premises during the two-year period, we modify the judgment to provide for an award of $1,049,502.56 in actual damages.

8. Appellees included some "unjust enrichment" language in their complaint.

In their tenth issue, appellants claim that the judgment improperly awarded attorney's fees to appellees. In doing so, they contend that appellees are not entitled to attorney's fees under section 38.001 of the Texas Civil Practice and Remedies Code because that statute does not authorize the recovery of attorney's fees for actions for trespass or conversion, which were the issues submitted to the jury. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 1997). Appellants also argue that attorney's fees are not recoverable under the declaratory judgment statute, Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (Vernon 1997) because, although it might have been couched in terms of a declaratory judgment action, the lawsuit was in effect "an action for the removal of a cloud on title to real property." Additionally, appellants contend, that even if this was a declaratory judgment action, there was no segregation of attorney's fees between claims for allowed fees and those which are not recoverable.

▮ In their second amended original petition, appellees sought a declaratory judgment declaring that the lease had expired and also asserted claims for trespass and conversion. In their answer, appellants sought a declaratory judgment that the lease had not terminated due to a lack of production. A trespass to try title suit is "the method of determining title to lands, tenements, or other real property." Tex. Prop.Code Ann. § 22.001 (Vernon 1984). The purpose of the Uniform Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." Tex. Civ. Prac. & Rem.Code Ann. § 37.002 (Vernon 1997). However, when the construction or validity of deeds or other documents of title is not involved, the suit is not one for declaratory judgment. *McRae Exploration & Production, Inc. v. Reserve Petroleum Co.*, 962 S.W.2d 676, 685 (Tex. App.—Waco 1998, no pet.).

▮ A trial court's award or denial of attorney's fees in a declaratory judgment action should not be reversed absent a clear abuse of discretion. *Oake v. Collin County*, 692 S.W.2d 454, 455 (Tex.1985). However, it has been held that it is error to award attorney's fees under the declaratory judgment act when the action is essentially one of trespass to try title. *McRae Exploration & Production, Inc.*, 962 S.W.2d at 685; *Ely v. Briley*, 959 S.W.2d 723, 727 (Tex.App.—Austin 1998, no pet.); *Barfield v. Holland*, 844 S.W.2d 759, 771 (Tex.App.—Tyler 1992, writ denied); *Kennesaw Life & Accident Ins. Co., v. Goss*, 694 S.W.2d 115, 118 (Tex.App.— Houston [14 th Dist.] 1985, writ ref'd n.r.e.).

▮ A suit to declare a mineral lease terminated by its own terms because of a cessation of production of oil or gas and to recover title and possession, is not a suit for cancellation, though its effect is the same. *Johnson v. Montgomery*, 31 S.W.2d 160, 165 (Tex.Civ.App.—Amarillo 1930, writ ref'd). Although the leasehold estate is a determinable fee which returns spontaneously to the grantor upon cessation of production, if re-entry is required, a suit in trespass to try title constitutes re-entry and is an appropriate action to recover possession. *Dennis v. Royal Petroleum Corp.*, 326 S.W.2d 538, 543 (Tex.Civ. App.—Texarkana 1959), *rev'd on other grounds*, 160 Tex. 392, 332 S.W.2d 313 (1960).

▮ The construction of the lease is not at issue in this particular case. By its terms it was to continue so long as gas was produced and marketed. Under the law, if production ceases and that cessation is not temporary, the lease automatically terminates and reverts to appellees, *i.e.*, the lease was valid but may have terminated by its own terms. Whether there has been a complete cessation of production and whether that cessation was temporary are evidentiary issues that do not rely upon a construction of the lease. Appellees

have argued vigorously that laches cannot be an affirmative defense to prevent a lease from lapsing by its own limitation, and that "[a]n action to determine that a determinable fee has lapsed and reverted is a legal action in trespass." We have agreed with appellees on this issue and, to be consistent apply that determination to the award of attorney's fees. Therefore, we find that this case was essentially an action for trespass to try title and not for declaratory judgment, and attorney's fees could not have been awarded under the declaratory judgment act.

■ However, that decision does not end our task, as appellees alternatively contend, that even if this case was essentially a trespass to try title suit, they were entitled to attorney's fees because appellants raised adverse possession as a defense. Indeed, appellants did assert a counterclaim for adverse possession of the minerals. Section 16.034(a) of the Texas Civil Practice and Remedies Code provides that in a "suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from a person unlawfully in actual possession, the court may award costs and reasonable attorney's fees to the prevailing party." Tex. Civ. Prac. & Rem.Code Ann. § 16.034(a) (Vernon 1986). It is true that, even if entitled to recover attorney's fees under this statute, "the person seeking possession must give the person unlawfully in possession a written demand for that person to vacate the premises," which must be given by registered or certified mail at least ten days before filing the claim for recovery. Tex. Civ. Prac. & Rem.Code Ann. § 16.034(b) (Vernon 1986). Parenthetically, no question has been raised in this appeal about noncompliance with this notice requirement.

It is the rule in a trespass to try title suit, where the defendant claims ownership by adverse possession, an award of attorney's fees to the prevailing party is

authorized. *See Terrill v. Tuckness*, 985 S.W.2d 97, 111 (Tex.App.—San Antonio 1998, no pet.); *City of Carrollton v. Duncan*, 742 S.W.2d 70, 79 (Tex.App.—Fort Worth 1987, no writ). Thus, the trial court, within its discretion, could award attorney's fees under this statute based on appellants' counterclaim.

■ Even so, appellants claim that even if attorney's fees are recoverable, appellees failed to produce evidence showing the amount of attorney's fees attributable to the actions for which attorney's fees may be recovered and those for which they may not. In other words, appellants claim that appellees had the duty to segregate the amount of attorney's fees attributable to each individual claim and failed to do so. However, appellants only objected to the submission of the jury questions regarding attorney's fees on the basis that there was no evidence to support the submission. By failing to object on the basis of the complaint they now make, appellants waived their right to make this complaint on appeal. *Home Sav. Assn. v. Guerra*, 733 S.W.2d 134, 137 (Tex.1987); *Matthews v. Candlewood Builders, Inc.*, 685 S.W.2d 649, 650 (Tex.1985). Issue ten is overruled.

Appellants assert in issue eleven that appellees are not entitled to prejudgment interest on the actual damages awarded. In response, appellees point out to us that the court did not award prejudgment interest in the judgment, so there is nothing for this court to consider. Appellees are correct. Appellants' eleventh issue is overruled.

■ In their twelfth issue, appellants complain that the trial court erred in awarding judgment for actual damages on a joint and several basis. In doing so, they posit that the damages may be easily apportioned, and when that is true, a defendant should only be liable for the damages that directly and proximately result from his own act. By way of reply, appellees claim that appellants are "commonly

owned, affiliated companies," and that they acted together to produce gas that did not belong to them. Therefore, they conclude, joint and several liability was properly imposed.

■ If injuries cannot be apportioned with reasonable certainty, then a plaintiff's injuries are indivisible, and defendants are jointly and severally liable for the whole. *Landers v. East Texas Salt Water Disposal Co.*, 151 Tex. 251, 248 S.W.2d 731, 734 (1952). On July 9, 1999, the parties entered into a stipulation that NGPL claimed title to the leasehold from 1951 through May 31, 1992; MidCon claimed title to the leasehold from June 1, 1992 through December 31, 1996; and MC Panhandle, Inc. and its successor-in-interest Chesapeake claimed title from January 1, 1997 to the present.[9] NGPL operated the wells on the lease from 1951 to December 31, 1996 (thereby acting as operator on MidCon's behalf), and MC Panhandle, Inc. and Chesapeake operated the wells from January 1, 1997 to the present. There was also testimony in the record that NGPL and MidCon were related companies, and that NGPL and MidCon may have had a parent company in common with MC Panhandle, Inc. Additionally, there is evidence in the record that MC Panhandle, Inc. merged into Chesapeake.

■ The distinction between separate corporate entities is generally recognized, and the fact that companies are related does not necessarily make any one company jointly and severally liable with its related companies. *Lucas v. Texas Industries, Inc.* 696 S.W.2d 372, 374 (Tex.1984); *Mortgage and Trust, Inc. v. Bonner & Co., Inc.*, 572 S.W.2d 344, 348 (Tex.Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.). However, the fact that NGPL operated the wells on MidCon's behalf up to January 1, 1997, provides a basis separate from their related status for imposing joint and several liability with respect to those two entities. The damages are otherwise easily apportionable. NGPL and MidCon are jointly and severally liable for damages for gas produced from the wells prior to January 1, 1997, and Chesapeake is liable for damages for gas produced from the wells from and including January 1, 1997. Appellants' eleventh issue is sustained to the extent that NGPL and MidCon are jointly and severally liable for the damages for gas produced prior to January 1, 1997, as stipulated by the parties and Chesapeake is liable for the damages stipulated by the parties for gas produced subsequent to that time. The trial court judgment is modified accordingly.

■ In their final issue, appellants claim that the trial court improperly awarded well and lease equipment to appellees. Appellees agree with this contention and state that this court "should, therefore, reform the judgment to delete its order that Plaintiffs are the owners of the 'casing, wellhead equipment, meterhouses, and all other equipment attached to the three existing gas wells on the subject property." Appellants' thirteenth issue is sustained, and the trial court's judgment is modified accordingly.

In summary, we overrule appellants' first six issues, their eighth, tenth and eleventh issues, and sustain appellants' seventh, ninth, twelfth and thirteenth issues. Accordingly, we modify the judgment of the trial court to delete the award of exemplary damages against appellants; to allow recovery of actual damages by appellees for the two-year period preceding the filing of the lawsuit in the amount stipulated to by the parties; to hold NGPL and MidCon jointly and severally liable for actual damages prior to January 1, 1997 and Chesapeake liable for damages from January 1, 1997 to the present in accordance with the stipulation agreed to by the parties; and to delete from the judgment the award of the wellbores, casing, wellhead equipment, meterhouses, and all other equipment attached to the existing gas

---

9. MC Panhandle, Inc. is not a party to this lawsuit.

wells on the subject property. Tex.R.App. P. 43.1(b). As modified, the judgment is affirmed.