**Dominick L. STERN, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–94–519–CR.**

Court of Appeals of Texas,
Fort Worth.

May 2, 1996.

Rehearing Overruled June 13, 1996.

The Law Office of Vaughn L. Bailey, Brenda Vickers and Todd J. Hodnett, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney; Betty Marshall and Charles M. Mallin, Chiefs of Appellate Section; Joetta Keene, David Kleckner, Assistant Criminal District Attorneys, Fort Worth, for Appellee.

Before DAY, RICHARDS, and HOLMAN, JJ.

## OPINION

HOLMAN, Justice.

A jury convicted Dominick L. Stern of murder with a deadly weapon (a firearm) and assessed punishment of seventy-five years' imprisonment in the Texas Department of Criminal Justice Institutional Division. His sole point of error is that, despite timely objection, the trial court abused its discretion by permitting the State to elicit inadmissible testimony about other crimes, wrongs, or acts in order to prove his character and show that he acted in conformity therewith. *See* TEX.R.CRIM.EVID. 404(b).

We affirm.

The date of the murder was November 19, 1993. About 8:00 p.m. that evening, three high school students were walking away from a convenience store in the Woodhaven area of Fort Worth when gunfire from a passing car wounded them. One, Anthony Garrett, died from his wounds. Two police officers near the scene heard the gunfire and one, Officer Gaskin, quickly encountered witnesses who said they had just seen a "drive-by shooting." The witnesses described the gunman's car as a dark-colored Pontiac driving east on Boca Raton street, and Officer Gaskin used his radio to broadcast the car's description. Nearby police patrol officers DeOreo and Harkrider heard the broadcast, drove east on Boca Raton, saw the suspected car, and stopped it.

Stern got out of that car and walked toward the two officers, and when they asked him to take his hands out of his pockets, he turned and ran until Officer Johnson arrived and arrested him. Stern was taken before a magistrate and warned of his rights. Later, Stern made a tape-recorded, typewritten confession to Detective Brannan that includes the following:

My name is Dominick L. Stern. I am 16 years of age, and my date of birth is January 8th, 1977. . . .

About 3:00 p.m. when Ketrick got out of school, we got together when he came by my house and picked me up. . . .

. . . .

. . . Ketrick told me to get my gun, so I went under my bed at the back of the house and got it.

My gun is a Tech–9 nine-millimeter. . . .

We went to the car and rode around in Rolling Hills and then we headed towards Meadowbrook. We went by a few apartment complexes and we didn't see anybody, so then we rode to Woodhaven.

Ketrick was still driving, and I was sitting on the passenger side in the front. Ketrick drove by three guys. They looked

about my age. They were black guys. One was wearing a White Sox jacket, one was wearing a Notre Dame jacket and one had a Chicago Bulls jacket. The White Sox jacket was black and white, the Notre Dame jacket was blue and yellow, and the Chicago Bulls was red and black.

He drove by the three guys and made a U-turn on the street and said something like "Those are the guys that shot my friend" or something like that.

Then I thought about it for just a second, then I aimed the gun out of the window and pointed towards the ground towards a tree stump where they were walking. I took about five or six shots, and they ducked down.

And then Ketrick said, "Let's go."

We head like towards the freeway and turned off a little service road and then we went all of the way down the service road, and there was no way out, so we turned back to the road we started off on.

And then a cop pulled us over. I put the gun up under the seat, the passenger side in which I was sitting on.

Officer then told us to get out of the car and put our hands on top of the car, and then I thought of what I had did, which was so idiotic and stupid, and then I broke out in a sprint.

First of all, I didn't mean to take anybody's life and I'm sorry for what I did. I wish someone would have remorse for me. I ruined my life. I made a stupid decision that I didn't want to occur in my life.

Signed Dominick Stern. [Dated November 20, 1993].

The confession was admitted into evidence.

After Stern made the confession, and on the same day, he was taken back to the magistrate, and she again warned him of his juvenile rights. On December 10, 1993, the 323rd District Court found Stern to be sufficiently sophisticated and mature to be tried as an adult and, because of the seriousness of the crime, waived its jurisdiction as a Juvenile Court. Stern was tried as an adult in Criminal District Court Number Three, where he pled not guilty. At trial, the court admitted the confession as State's Exhibit 1.

Policeman Kevin L. Woodson, a crime scene officer, testified that he was called to the scene of the shooting at 8:36 p.m. to investigate. In the investigation, he found a handgun lying on the floorboard under the right passenger seat of the Pontiac. He took the gun from the car and found it loaded with a clip of twenty nine-millimeter bullets and one .380 bullet, all which were admitted as evidence.

During the crime scene investigation, Officer Woodson also found two blue "cloth[s]," which were bandannas, tucked into the car's front right passenger seat. He also took custody of victim Anthony Garrett's clothing, which included both a red "Starter Jacket" that bore the logo of the San Francisco 49ers football team and a sweatshirt that bore the logo of the Chicago Bulls basketball team. The sweatshirt was admitted in evidence as State's Exhibit 9–A, the jacket was admitted as State's Exhibit 10–A, and the bandannas were admitted as State's Exhibits 11–A and 11–B.

Homicide detective Curtis Brannan also investigated the crime scene and saw the blue bandannas and the nine-millimeter semiautomatic handgun in the Pontiac on the night of the shooting. At trial, the jury listened as he read aloud Stern's confession, without objection.

Timothy Gillian, one of the wounded, testified that when he was walking along the street with his companions about 8:00 p.m. on November 19, 1993, he heard a voice yell "What's up, cuz?" He turned around and "saw sparks flying, so we all hit the ground."

The autopsy of Anthony Garrett was done by Marc Andrew Krause, Deputy Chief Medical Examiner for Tarrant, Denton and Parker Counties. He examined the gunshot wounds, determined the fatal wound, and concluded that the manner of death was a homicide.

Byron Max Courtney is a forensic scientist/criminalist called by the defendant to testify as an expert. He testified that he had investigated the physical evidence held by the police, including the fired cartridge cases from the scene, the bullet taken from the deceased victim's body, and the firearm.

Courtney opined that it was possible that all the bullets fired could have ricocheted off the pavement before striking Anthony Garrett and his companions. He told jurors that he had tested the Tech-9 handgun and found that it would not fire a .380 bullet. Courtney also agreed with the defense attorney that it was possible that Stern "fired all these shots to the ground."

On cross-examination, Courtney was shown State's Exhibit 33, a photograph he had not seen before, depicting the deceased victim's chest wound. He agreed with the prosecutor that the wound's appearance was consistent with the conclusion that it was made by a bullet that had not ricocheted. He also agreed that it was possible that the deceased victim was standing up when hit by the first bullet, then fell and was hit by the remaining bullets.

The target of Stern's point of error is the testimony of a member of the gang intelligence unit of the Fort Worth Police Department who was an expert witness called by the prosecution. ✦ The officer testified about his knowledge of gangs in Tarrant County, including one called the Crips and their rival gang called the Bloods. He told jurors that the Crips in Tarrant County have divisions called the "103rd and Grape Street" Crips, the "Five Deuce Hoova" Crips, the "Four Trey Gangster" Crips, "Polywood" Crips, and "Forest Hill Circle." He testified that "Crips and Bloods consider each other as ultimate enemies or to kill on sight if confronted by one another." He told of the "hand signs" that gang members use to identify each other, and he described special items of clothing and tatoos that they use to identify themselves as gang members.

The gang intelligence officer testified that he was familiar with areas of Fort Worth that are considered to be "Blood territories," and that the Woodhaven area where the murder occurred is considered by the gang members to be Blood territory. Most Bloods wear the color red to identify themselves as members of a Blood gang, and most Crips wear the color blue, although some wear purple. He told jurors that the blue bandannas are considered the Crips' gang flag. The officer testified that a person wearing a red

49ers jacket or a Chicago Bulls shirt would be perceived by Crips as insulting the Crips gang and as justifying retaliation or violence against a person wearing those red clothes. He told the jury that Bloods wear the logo of the Chicago Bulls basketball team, perceiving the letters of the word "Bulls" as a code for the phrase "Bloods usually last longer, suckers."

The officer knew Stern on sight and identified him in the courtroom. He testified that he had heard Stern admit being a member of the "103rd and Grape Street" Crips gang in Fort Worth, and that he had seen Stern wear the gang's purple shoestrings, shirt, and identifying tatoo. The officer told jurors about gang terminology and initiation rites in which a prospective member is "jumped into" the gang, meaning that the prospect is assaulted by gang members and must fight them all for thirty to sixty seconds. He testified that Stern admitted joining the Crips by being "jumped-in," and that the term "C'ed down" is a synonym for the term "jumped-in." The officer testified that among the ways a member attains status within the gang "is to go out and put in some work," or "[pull] a lick, which is a robbery, robbing an individual in the name of the gang." The officer defined the term "putting in work" as "going out and doing a drive-by shooting or going out on a BK ride, as they call it, which is riding around looking for the rival gang members walking the street." He testified that the "ultimate status is to get an OG license. OG in street term is considered original gangster or a leader of a gang ... [t]o become an OG, you have to kill a rival gang member." He also told jurors that Ketrick, whom Stern's confession identifies as the Pontiac's driver, claims to be a member of the "103rd and Grape Street" Crips. About the handgun and ammunition clip admitted in evidence, he testified that "[t]his gun is actually an Intratech 9. Lot of gang members like to use it because it's portrayed as a weapon of gang members through their particular music that they listen to or gangster-style rap. It's portrayed as a very dominant weapon." He agreed with the prosecutor that the gun is a deadly weapon.

The prosecutor's direct examination of the officer concluded with the following exchange:

Q. A Crip gang member, a 103rd Grape Street Crip, how would he get someone's attention that he was going to—let me ask it this way, Officer: What does "What's up, cuz," mean to a Crip gang member?

A. Cuz is a term used between Crip to Crip to address each other, to identify each other. It's a very positive term from Crip to Crip.

Q. What does a Crip gang member, when he says, "What's up, cuz," to someone who is wearing a red jacket, what does that signify?

A. To a rival gang member, it means death. It means that I am telling you the gang that I represent, before I kill you to get a reaction from you.

Q. If a person was to be driving in an automobile—if a 103 Grape Street Crip was to be driving in an automobile in a Blood territory and they drive by someone who is wearing a red 49er's jacket and a Chicago Bulls sweatshirt like that, having a blue bandanna with them, with a Tech-9 nine-millimeter handgun, and was to yell out the window to the person wearing that jacket, "What's up, cuz," what does that mean?

A. It means they are getting ready to shoot them and kill them or attempt to kill them.

Q. Are you familiar with the Meadowbrook area of Fort Worth?

A. Yes, sir, I am.

Q. And can you tell the ladies and gentlemen of the jury what gang predominantly would claim that as their territory or hangout back in 1993 of November [sic]?

A. Blood sets, or Bloods.

Q. Same as the Woodhaven area?

A. Yes, sir.

■ Stern asserts that the officer testified only as an expert about gangs in general and that he did not testify in the capacity of an investigator involved at the crime scene. Stern argues that the officer's entire direct testimony was inadmissible under rule 404 of the Texas Rules of Criminal Evidence because it was an effort by the State to prove the character of gangs and gang members in order to show that Stern, as a member of the Crips, acted in conformity with that character on November 19, 1993.

■ Stern correctly contends that he should not be tried for some collateral crime or for being a criminal generally. *See Abdnor v. State,* 871 S.W.2d 726, 738 (Tex.Crim. App.1994). Because evidence of a defendant's extraneous offenses or general bad character may tend to confuse the issues in his case and force him to defend against charges not included in the indictment, such evidence is not admissible during the guilt/innocence portion of the trial to show that, with regard to the charged offense, the defendant acted in conformity with his criminal nature. *Id.*

■ However, such evidence is admissible where it is material and relevant to a contested issue in the case, such as to show motive. *Id.; see* Tex.R.Crim.Evid. 404(b). In Stern's case, the court determined the gang intelligence officer's testimony relevant and admissible on the issue of motive, making the following ruling outside the jury's presence:

I think that as far as [the gangs] having malice towards each other, it would go to motive. And the fact that [Stern] was a Crip. He was in Blood territory. That it was a way to gain status in the organization. I realize this is very prejudicial, but it goes to the heart of what this alleged murder is about.

And I am going to permit them—and I don't think—it's 404 in that it's extraneous conduct to some extent, but it's not really the issue. The issue is intent and why [Stern]—or the State's version of why [Stern] did this. I am going to permit those things to be shown.

■ The determination of relevance is for the trial judge, and an appellate court is not to substitute its perception of relevance for that of the trial court. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App. 1990). To be relevant, evidence must have a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Tex.R.Crim.

EVID. 401. Motive is not an essential element of a criminal offense, but the prosecution is always entitled to offer evidence of motive to commit the charged offense because it is relevant when it fairly tends to raise an inference that the accused had a motive to commit the crime alleged. *Gosch v. State,* 829 S.W.2d 775, 783 (Tex.Crim.App. 1991), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993); *Rodriguez v. State,* 486 S.W.2d 355, 358 (Tex.Crim.App. 1972).

If evidence of motive also happens to involve an extraneous act of misconduct by the accused, it is nevertheless admissible if the relevancy value of the testimony outweighs its potential for undue prejudice. *Gosch,* 829 S.W.2d at 783; *see* TEX.R.CRIM. EVID. 403. Stern's trial attorney argued, under rule 403, that the prejudicial effect of the gang intelligence officer's testimony would greatly outweigh its probative value. Because the court did not accept that argument, we may presume the court conducted a rule 403 balancing test, which need not be announced for the record. *Nolen v. State,* 872 S.W.2d 807, 812 (Tex.App.—Fort Worth 1994, pet. ref'd.).

When the balancing test is applied, evidence of the context of the offense is almost always admissible under the reasoning that events do not occur in a vacuum and the jury has a right to have the offense placed in its proper setting so that all evidence may be realistically evaluated. *Mann v. State,* 718 S.W.2d 741, 744 (Tex.Crim.App. 1986), *cert. denied,* 481 U.S. 1007, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987). Rarely will the prejudicial value render inadmissible any evidence that is context of the offense. *Id.*

Because reasonable men may disagree whether in common experience a particular inference is available from the evidence, an appellate court will not disturb a trial court's ruling on relevancy as long as it is within the zone of reasonable disagreement for the trial judge to find the evidence relevant. *Rogers v. State,* 853 S.W.2d 29, 32 (Tex.Crim.App.1993); *Montgomery,* 810 S.W.2d at 391. The admission of background or "context of the offense" evidence is not a question for appellate courts unless the evidence appears to have been admitted by a

trial court in order to subvert rule 404(b) by letting inadmissible evidence of other crimes, wrongs, or acts prove the accused's character under the guise of "background" or "context." *Mayes v. State,* 816 S.W.2d 79, 86 (Tex.Crim.App.1991). In Stern's case, we do not find such a subversion of rule 404(b).

It was held long ago that to show motive for a homicide, past quarrels between an accused murderer and the victim are admissible over an extraneous offense objection. *Norwood v. State,* 135 Tex.Crim. 406, 120 S.W.2d 806, 808 (1938). By analogy that we believe reasonable and appropriate, we conclude that the gang intelligence officer's testimony describing the Bloods, Crips, and the malice that existed between them, was proper contextual or background evidence in Stern's case.

We hold that the trial court did not abuse its discretion by admitting the gang intelligence officer's testimony to show a motive for the murder. Stern's sole point of error is overruled, and the conviction is affirmed.