Davis v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-169-CR

JESSIE RAY DAVIS APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

A jury found Jessie Ray Davis guilty of aggravated assault with a deadly weapon, and the trial court assessed his punishment at ten years’ imprisonment.  In two issues on appeal, Davis complains that the trial court erred in excluding a cassette tape containing several threatening phone calls allegedly made by the complainant, Carol Gowans, and in instructing the jury that proof beyond a reasonable doubt is not proof beyond all possible doubt.  We will affirm.

II.  Factual Background

Jessie Davis and Carol Gowans had once been married, but they stopped cohabitating in November of 2000.  On March 6, 2002, Gowans played pool at two establishments and then departed for her residence around one in the morning after having spent some time speaking with Alvin Smith, a friend of Gowans’s late brother, in the parking lot of the second establishment. 

According to Gowans, as she headed home on Avenue J, Gowans noticed a car approaching from the rear at a very high speed.  The car pulled alongside her car, and she then stopped her car.  Gowans testified that the other car, which also stopped, was driven by Davis, who had his car’s passenger side window down and was “fussing” at her, saying “uh-huh, I know you was F’ing Blue.”
(footnote: 2)  When Gowans denied Davis’s accusation, he said, “[T]hat’s all right, I told you I’m going to kill you, B.”

In response to Davis’s threat to kill her, Gowans “mashed the gas [pedal],” but he matched her speed, staying even with her.  As they traveled side-by-side, Gowans saw a silver chrome gun in his hand.  Upon hearing four sounds that she characterized as having sounded like gunshots, “plow, plow, plow, plow” in rapid succession, Gowans “just leaned over to the side.”  Gowans continued to steer until her car stopped and started to move backwards slightly, at which point she “mashed the brakes” but continued to stay bent down.  When Gowans finally looked out the front of her car, she saw Davis turning right on Miller Street. 

Gowans was approached almost immediately by Smith, who had pulled out of the second establishment’s parking lot right after she had.  From his position about three car lengths behind Gowans, Smith testified that he had noticed how a second vehicle, red in color, had come up behind Gowans’s car that he later identified as Davis’s red vehicle.  Smith had continued to follow Gowans and the other car because he had noticed that the other car had been activating its high beam headlights towards Gowans’s car.

Smith testified that at one stop sign, the second car pulled alongside Gowans’s car on the left.  Smith stated that he could hear loud comments being exchanged between the two cars before both cars “took off.”  As he continued to follow the two cars, Smith activated the high beam headlights of his vehicle and saw that the second car was occupied by only one person, whom he could not identify.  Smith witnessed the driver of the second car extend an arm and hand holding a black object in the direction of Gowans’s car.  Smith then saw fire come from the object.  Smith testified that, knowing that someone was firing a weapon directly at the front door of Gowans’s car, he slowed down his vehicle and started dialing 911 on his cellular telephone.  Smith said that he saw the red car turn right at Miller Street and noticed Gowans’s car run up into an area that appeared to be a vacant lot.  Smith jumped out of his own vehicle and ran toward Gowans’s car to see if she had been shot, only to see Gowans get out of her car, fall to the ground, and scream hysterically that her husband had been trying to kill her.  Smith said that while he was dealing with Gowans, the 911 call-taker told him to get in a car and get out of the area until a police officer arrived on the scene.  In response to this advice, Smith took Gowans in his vehicle, drove off, and turned left on Miller Street, just as the first police officer was arriving at the crime scene.  After telling the 911 call-taker that he had seen the officer, he heeded her advice and drove back to Gowans’s car.  Once there, Smith noticed broken glass and bullet holes in the driver’s side door.  He later observed bullet holes in Gowans’s clothing after they were discovered by the crime scene officer, P.C. Jay. 

The first officer on the scene was Gilbert Moreno, who spoke to Gowans.  He testified that the still-excited Gowans told him how Davis had followed her and shot at her, and how she had played dead after the shots were fired.  Officer Moreno testified that there were three gunshot holes in the car door, that the window of Gowans’s car was broken, and that the gunshot hole in the seat of the car corroborated her story.  Officer Moreno also said that he had found Gowans’s car “above the curb on the south part of Avenue J in the upper lot,” which was consistent with the testimony of both Gowans and Smith regarding how and where Gowans’s car had come to rest.  He was also present when the two gunshot holes in Gowans’s clothing had been discovered by Officer Ray. 

The gunshot holes in Gowans’s jacket and blouse were first noticed by Officer Ray.  Ray testified that he began looking for the gunshot holes in Gowans’s clothing only after having noticed the pattern and placement of the gunshot holes in the car.  He stated that Gowans had not noticed the gunshot holes in her clothing and became even more upset upon realizing how close she had come to having been wounded in the crime.  Gowans’s shirt had four gunshot holes, two of which represented points of entry and two of which represented points of exit for the two bullets that had gone through the shirt.  
Gowans testified that the gunshot holes had not been present on the blouse prior to the commission of the crime.  
Ray also found a bullet embedded in the foam of the right portion of the driver’s seat. 

III.  Procedural Background

By an indictment filed May 21, 2002, Davis was charged with one count of aggravated assault with a deadly weapon and one count of attempted murder.  Davis pleaded “not guilty” to the charge of aggravated assault after the State waived the attempted murder count.  Trial on the merits commenced on February 11, 2003.  The jury found Davis guilty of aggravated assault with a deadly weapon.  A sentencing hearing was conducted before the trial court on April 25, 2003, and after reviewing the pre-sentence investigation report, hearing testimony and the argument of counsel, the trial court assessed Davis’s punishment at ten years’ confinement. 

IV.  The Tape

The defense’s theory in the case was that Gowans and Smith staged the shooting to frame Davis.  During the guilt/innocence phase of trial, the defense attempted to put into evidence an audio tape of several phone messages left by Gowans on the voicemail of Davis or Davis’s girlfriend, Patricia Lee.  Patricia Lee testified that during 2002, Gowans placed numerous threatening phone calls to her cell phone, work phone, and home phone, and that she would receive four to five of these threatening phone calls per day.  During the period of March 6, 2002 through May 2002, Lee received approximately 150 phone calls from Gowans.  Lee also testified that she received a call from Gowans in the early morning hours of March 7, 2002, and that Gowans left a message on her answering machine.  Also according to Lee, she and Davis were living together at the time of the alleged offense, and she would have remembered if he had been out late at night at that time; however, she did not have such a memory. Finally, Lee testified that she had known Davis for several years and never knew him to own a handgun and had never seen him with a handgun.

Gowans admitted on cross-examination by the defense that she called Davis several times on the day of the shooting and several times in the hours following the shooting.  However, she denied placing a phone call to Davis’s home at 1:26 a.m., just prior to the shooting, despite the fact that her cellular phone records indicated that such a call had been placed.  Gowans also admitted to having regular contact with Davis in the months following the shooting despite her testimony that she was afraid of him, including being alone with him in a motel room in December 2002.  During Gowans’s testimony, Davis’s counsel approached the bench and sought permission to ask Gowans about her telephone calls to Davis in an effort to show that her allegations that Davis shot at her were actually part of her plan of threatening and stalking conduct towards him.  The trial court recessed the jury and permitted Davis to develop the record.  

After questioning Gowans outside the presence of the jury about a number of the phone calls reflected within telephone records and securing Gowans’s admission that she had placed a number of the telephone calls in question, Davis played the tape to the court.  Davis offered the tape pursuant to Texas Rule of Evidence 404 to show Gowans’s harassment of Smith and his girlfriend and her motive, preparation, and plan to frame Davis for the shooting.  In response to the first portion of the tape Davis played, Gowans testified she could not understand what was contained on the tape, much less identify whether the voice on the tape was her own.  Regarding the next portion of the tape, Gowans could not identify whether the tape contained her talking to someone or someone talking to her.  When Davis played the third portion of the tape, Gowans admitted that it contained her voice asking Davis to call her; however, Gowans asserted that she thought she had made that phone call in January 2003.  When told that the tape had been in the possession of the State and Davis before October of 2002, Gowans testified that she could not identify the time frame she had left that third message.

The fourth portion of the tape contained a song.  Gowans testified she did not know who had sung the song or whether she had been the one who had caused the song to be recorded on the answering machine.  When Davis played the next portion of the tape, Gowans admitted that it was her voice.   While Gowans expressed some uncertainly regarding when she had placed the call, she thought she had left the message on November 20, 2002.  Gowans admitted not only that the next portion of the tape contained her voice but also that she had directed her comments about a person being “one sorry bitch” to Davis.  While Gowans “guess[ed]” that she had left that message after the night of the crime, she also stated that she could not remember when she had left the message.  Concerning the next message, Gowans admitted that the voice was hers, but that she did not know exactly when she had made the phone call and left the message.  Gowans did assert, however, that the message had to have been left after the time the crime had been committed.  When asked about the final message, Gowans admitted that the voice on the tape was hers and that her comments were directed towards Davis.  Regarding the timing of when she had made the telephone call, however, Gowans expressed confusion as to whether the message had been made around the time that Davis had committed his later misdemeanor assault of her or around the time he had committed the instant offense.  Ultimately, though, Gowans stated that she did not know the date she had made the telephone call. 

Gowans also admitted that the tape contained her voice, a threat to Patricia Lee, and a statement that Davis was “going to jail.” 

Davis’s counsel argued that the entire tape should come in as impeachment evidence and to show Gowans’s motive in trying to frame Davis for the alleged assault.
(footnote: 3)  Davis’s counsel never tried to admit only a portion of the tape into evidence.  The trial court refused to admit the tape based on grounds of relevance and “that the predicate has not even been made on it.” When the trial court indicated that the tape would be not admitted into evidence, Davis’s counsel stated on the record, “We reserve the right to try and bring it in through another witness.”  However, 
Davis did not move to introduce the tape — or even a limited portion thereof — during the testimony of his other witness with knowledge of the tape, Patricia Lee. 

V.  Exlcusion of the Audio Tape

In his first point, Davis asserts that the trial court abused its discretion in finding that the cassette tape was not relevant under Texas Rule of Evidence 401.

A.  Standard of Review

The decision to exclude evidence is reviewed under an abuse of discretion standard.  
See Chambers v. State
, 866 S.W.2d 9, 26-27 (Tex. Crim. App. 1993), 
cert. denied
, 511 U.S. 1100 (1994).  A trial court’s ruling constitutes an abuse of discretion when made without reference to any guiding rules or principles, so as to render the conclusion ultimately reached arbitrary, unreasonable, and outside the zone within which reasonable minds may differ.  
See Montgomery v. State
, 810 S.W.2d 372, 380, 391 (Tex. Crim. App. 1990) (op. on reh’g).  Great deference is given to the trial court’s decision to admit or exclude evidence even to the point of allowing the trial court a limited right to be incorrect so long as the trial court’s decision is not arbitrary and capricious.  
See Powell v. State
, 898 S.W.2d 821, 826 (Tex. Crim. App. 1994), 
cert. denied
, 516 U.S. 991 (1995); 
Rogers v. State
, 853 S.W.2d 29, 32 (Tex. Crim. App. 1993).  If the trial court’s decision to exclude evidence falls within the zone within which reasonable minds may differ, we refrain from disturbing the trial court’s decision on appeal.  
See Montogomery
, 810 S.W.2d at 391. Additionally, determinations of relevance are within the trial court’s province and we will not substitute our perception of relevance for that of the trial court.  
Stern v. State
, 922 S.W.2d 282, 286 (Tex. App.—Fort Worth 1996, pet. ref’d) (citing 
Montgomery
, 810 S.W.2d at 391).

B.  Analysis

While Davis contests the trial court’s relevance ruling, he nowhere contests the trial court’s alternative grounds for refusing to admit the tape, that “the predicate had not even been made on it.”  While the trial court’s predicate reference is somewhat vague, there indisputably was an inability to identify that all of the recordings were of Gowans’s voice, as well as an inability to identify whether she had left the song on the tape and its meaning, and whether each of the recordings that had been identifiable as her voice had been left before the shooting when Gowan was allegedly planning to frame Davis, or after the shooting.

The messages on the tape that were unidentified had no relevance as to Gowans and her alleged nefarious motives and, left unidentified, lacked a proper predicate for admission.  Evidence is “relevant” if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”  
Tex. R. Evid. 401.  
All relevant evidence is admissible unless specifically prohibited by Constitution, statute, or rule.  
Tex. R. Evid
. 402.  Further, Rule 404 specifically provides that evidence of extraneous wrongs or acts may be admissible to show a person’s motive, preparation, and plan.  
Tex. R. Evid
. 404(b).  However, because Davis was offering the entire tape and since the record shows that certain portions of it were not connected to Gowans, the trial court committed no error in refusing to admit the entire tape into evidence.  
See, e.g., Garcia v. State
, 887 S.W.2d 862, 874 n.6 (Tex. Crim. App. 1994), 
cert. denied
, 514 U.S. 1021 (1995) (holding a letter containing admissable and inadmissable (hearsay) evidence could be held properly excluded), 
overruled on other grounds by Hammock v. State
, 46 S.W.3d 889 (Tex. Crim. App. 2001); 
Jones v. State
, 843 S.W.2d 487, 491 (Tex. Crim. App. 1992) (regarding an exhibit containing both admissible and inadmissible evidence, a trial court may “safely admit it all or exclude it all, and the losing party, no matter who he is, will be made to suffer on appeal the consequences of his insufficiently specific offer or objection”), 
cert. denied
, 507 U.S. 1035 (1993), 
overruled on other grounds
 
by
 
Maxwell v. State
, 48 S.W.3d 196 (Tex. Crim. App. 2001).
(footnote: 4)
 Further, the trial court’s evidentiary ruling not admitting the tape is a ruling that will be upheld on any theory of law that is applicable to the case, including that the “predicate had not been made on it.”  
See, e.g., Prystash v. State
, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1102 (2000);
 Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim App. 1990).  Indeed,  we have held that “
if the ruling was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment.   
.”  
Sauceda v. State, 
129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

In sum, since the trial court refused to admit the tape only after having heard Gowans’s testimony about the different messages contained thereon, which were not all from Gowans, were not at identified times, and were not all concerning an alleged plot to frame Davis, the trial court cannot be deemed to have abused its discretion by acting arbitrarily or capriciously without reference to any guiding rules or principles in refusing to admit the entire tape when offered.  
See Montgomery
, 810 S.W.2d at 380, 391.  

C.  Harm Analysis

In any event, we conclude that any error committed by the trial court in failing to admit the tape was harmless error.  The trial court’s exclusion of defensive evidence merits review under the standard for constitutional error only if the exclusion effectively precludes the defendant from presenting a defense.  
See Potier v. State
, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).  “Exclusions of evidence are unconstitutional only if they ‘significantly undermine fundamental elements of an accused’s defense.’”  
Id. 
at 666 (quoting 
United States v. Scheffer
, 523 U.S. 303, 118 S. Ct. 1261, (1998).  If the erroneously excluded evidence was relevant to the defensive theory, but its exclusion did not prevent Davis from presenting a defense, the proper harm analysis standard is the test used for non-constitutional error embodied by both Texas Rule of Evidence 103(a) and Texas Rule of Appellate Procedure 44.2(b).  
See id
.  Despite the trial court’s complained-of ruling, Davis was still able to present his defensive theory, through the testimony of Patricia Lee and the testimony elicited during his cross-examination of Gowans, that sought to show that Gowans had been an obsessed woman who had fabricated the evidence of the shooting.  Therefore, the harm analysis at hand is of the non-constitutional type that Davis concedes is proper.  That is, it is the “substantial right” harm analysis under Rule 103(a) and Rule 44.2(b).  
Tex. R. Evid. 
103(a) (“Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected”); 
Tex. R. App. P.
 44.2(b) (“Any . . . error . . . that does not affect substantial rights must be disregarded.”).  

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury’s verdict.  
King v. State
, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing 
Kotteakos v. United States
, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); 
Coggeshall v. State,
 961 S.W.2d 639, 643 (Tex. App.—Fort Worth 1998, pet. ref’d).  In making this determination, we review the record as a whole. 
 See Johnson v. State
, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).  
Because we have determined that Davis was able to present to the jury his defensive theory of being framed by Gowans, we hold that any alleged error in failure to admit the tape did not have a substantial and injurious effect or influence in determining the jury’s verdict.  Accordingly, if any error was committed in the failure to admit the tape, it was harmless error. 
 Therefore, Davis’s first point is overruled.

VI.  Charge of the Court

In his second point, Davis contends the trial court erred by including in the jury charge language to the effect that proof beyond a reasonable doubt is not proof beyond all possible doubt.  The State responds, and Davis concedes, that this court has previously ruled on this issue and found the instruction not to be improper.  Davis requests, however, that the court reconsider the issue.  We decline to do so.

The trial court included the following in its charge to the jury regarding the burden of proof:

It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution’s proof excludes all “reasonable doubt” concerning the Defendant’s guilt.

As both Davis and the State acknowledge, this court has addressed the propriety of such an instruction on numerous occasions and found it not to be improper.  
See, e.g., Best v. State
, 118 S.W.3d 857, 865 (Tex. App.—Fort Worth 2003, no pet.).  Accordingly, we hold that the instruction given was not improper.  Davis’s second point is overruled.

VII.  Conclusion

Having overruled all Davis’s points, the judgment of the trial court is affirmed.

BOB MCCOY

JUSTICE

PANEL A: CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED:  May 12, 2005

FOOTNOTES
1:
See 
Tex. R. App. P.
 47.4.

2:
Gowans explained that even though she had used the term “F-ing,” that Davis had used another word that meant “sleeping with.” 

3:
Davis’s defensive theory of a frame-up would have required the jurors to have believed that Gowans had conspired with Smith to take the following actions:  (1) have her car shot with bullets; (2) position the car on Avenue J; (3) have Smith make a false call to 911 reporting the crime; (4) claim that the same type of automobile — with which Davis just happened to appear in a photograph — had been the car from which the shots had fired; (5) have Smith — rather than claim that he could identify the shooter — testify that he could not identify the assailant of Gowans.  Further, this theory would have required the jurors to believe the following:  (6) that both Gowans and Smith had the foresight and cunning to act as if they had not noticed the gunshot holes in Gowans’s clothing on the offhand chance that the investigating officers would somehow be the ones to notice the holes in Gowans’s clothing; (7) that Gowans’s scheme had included her ability to act so as to convince Officier Ray that she actually had been unaware of the gunshot holes and that her realization thereof had actually made her even more upset about what had happened; a
nd (8) that she still called Davis after the crime and though afraid of him, stayed alone with Davis in a motel room later in 2002.  

4:
Maxwell
 abrogated 
Jones 
on the issue of being able to impeach a witness with his status as someone who was serving deferred adjudication probation.  
See Maxwell
, 48 S.W.3d at 199-200.