COURT OF 
APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-03-169-CR
  
  
JESSIE 
RAY DAVIS                                                                APPELLANT
  
V.
  
THE 
STATE OF TEXAS                                                                  STATE
  
  
------------
 
FROM 
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY
 
------------
 
MEMORANDUM OPINION[1]
 
------------
I. Introduction
        A 
jury found Jessie Ray Davis guilty of aggravated assault with a deadly weapon, 
and the trial court assessed his punishment at ten years’ imprisonment. In two 
issues on appeal, Davis complains that the trial court erred in excluding a 
cassette tape containing several threatening phone calls allegedly made by the 
complainant, Carol Gowans, and in instructing the jury that proof beyond a 
reasonable doubt is not proof beyond all possible doubt. We will affirm.
II. Factual Background
        Jessie 
Davis and Carol Gowans had once been married, but they stopped cohabitating in 
November of 2000. On March 6, 2002, Gowans played pool at two establishments and 
then departed for her residence around one in the morning after having spent 
some time speaking with Alvin Smith, a friend of Gowans’s late brother, in the 
parking lot of the second establishment.
        According 
to Gowans, as she headed home on Avenue J, Gowans noticed a car approaching from 
the rear at a very high speed. The car pulled alongside her car, and she then 
stopped her car. Gowans testified that the other car, which also stopped, was 
driven by Davis, who had his car’s passenger side window down and was 
“fussing” at her, saying “uh-huh, I know you was F’ing Blue.”[2]  When Gowans denied Davis’s accusation, he said, 
“[T]hat’s all right, I told you I’m going to kill you, B.”
        In 
response to Davis’s threat to kill her, Gowans “mashed the gas [pedal],” 
but he matched her speed, staying even with her.  As they traveled 
side-by-side, Gowans saw a silver chrome gun in his hand.  Upon hearing 
four sounds that she characterized as having sounded like gunshots, “plow, 
plow, plow, plow” in rapid succession, Gowans “just leaned over to the 
side.” Gowans continued to steer until her car stopped and started to move 
backwards slightly, at which point she “mashed the brakes” but continued to 
stay bent down.  When Gowans finally looked out the front of her car, she 
saw Davis turning right on Miller Street.
        Gowans 
was approached almost immediately by Smith, who had pulled out of the second 
establishment’s parking lot right after she had.  From his position about 
three car lengths behind Gowans, Smith testified that he had noticed how a 
second vehicle, red in color, had come up behind Gowans’s car that he later 
identified as Davis’s red vehicle.  Smith had continued to follow Gowans 
and the other car because he had noticed that the other car had been activating 
its high beam headlights towards Gowans’s car.
        Smith 
testified that at one stop sign, the second car pulled alongside Gowans’s car 
on the left. Smith stated that he could hear loud comments being exchanged 
between the two cars before both cars “took off.” As he continued to follow 
the two cars, Smith activated the high beam headlights of his vehicle and saw 
that the second car was occupied by only one person, whom he could not 
identify.  Smith witnessed the driver of the second car extend an arm and 
hand holding a black object in the direction of Gowans’s car. Smith then saw 
fire come from the object.  Smith testified that, knowing that someone was 
firing a weapon directly at the front door of Gowans’s car, he slowed down his 
vehicle and started dialing 911 on his cellular telephone.  Smith said that 
he saw the red car turn right at Miller Street and noticed Gowans’s car run up 
into an area that appeared to be a vacant lot. Smith jumped out of his own 
vehicle and ran toward Gowans’s car to see if she had been shot, only to see 
Gowans get out of her car, fall to the ground, and scream hysterically that her 
husband had been trying to kill her. Smith said that while he was dealing with 
Gowans, the 911 call-taker told him to get in a car and get out of the area 
until a police officer arrived on the scene. In response to this advice, Smith 
took Gowans in his vehicle, drove off, and turned left on Miller Street, just as 
the first police officer was arriving at the crime scene. After telling the 911 
call-taker that he had seen the officer, he heeded her advice and drove back to 
Gowans’s car. Once there, Smith noticed broken glass and bullet holes in the 
driver’s side door. He later observed bullet holes in Gowans’s clothing 
after they were discovered by the crime scene officer, P.C. Jay.
        The 
first officer on the scene was Gilbert Moreno, who spoke to Gowans. He testified 
that the still-excited Gowans told him how Davis had followed her and shot at 
her, and how she had played dead after the shots were fired.  Officer 
Moreno testified that there were three gunshot holes in the car door, that the 
window of Gowans’s car was broken, and that the gunshot hole in the seat of 
the car corroborated her story.  Officer Moreno also said that he had found 
Gowans’s car “above the curb on the south part of Avenue J in the upper 
lot,” which was consistent with the testimony of both Gowans and Smith 
regarding how and where Gowans’s car had come to rest.  He was also 
present when the two gunshot holes in Gowans’s clothing had been discovered by 
Officer Ray.
        The 
gunshot holes in Gowans’s jacket and blouse were first noticed by Officer Ray. 
Ray testified that he began looking for the gunshot holes in Gowans’s clothing 
only after having noticed the pattern and placement of the gunshot holes in the 
car. He stated that Gowans had not noticed the gunshot holes in her clothing and 
became even more upset upon realizing how close she had come to having been 
wounded in the crime.  Gowans’s shirt had four gunshot holes, two of 
which represented points of entry and two of which represented points of exit 
for the two bullets that had gone through the shirt.  Gowans testified that 
the gunshot holes had not been present on the blouse prior to the commission of 
the crime.  Ray also found a bullet embedded in the foam of the right 
portion of the driver’s seat.
III. Procedural Background
        By 
an indictment filed May 21, 2002, Davis was charged with one count of aggravated 
assault with a deadly weapon and one count of attempted murder.  Davis 
pleaded “not guilty” to the charge of aggravated assault after the State 
waived the attempted murder count.  Trial on the merits commenced on 
February 11, 2003.  The jury found Davis guilty of aggravated assault with 
a deadly weapon.  A sentencing hearing was conducted before the trial court 
on April 25, 2003, and after reviewing the pre-sentence investigation report, 
hearing testimony and the argument of counsel, the trial court assessed 
Davis’s punishment at ten years’ confinement.
IV. The Tape
        The 
defense’s theory in the case was that Gowans and Smith staged the shooting to 
frame Davis.  During the guilt/innocence phase of trial, the defense 
attempted to put into evidence an audio tape of several phone messages left by 
Gowans on the voicemail of Davis or Davis’s girlfriend, Patricia Lee.  
Patricia Lee testified that during 2002, Gowans placed numerous threatening 
phone calls to her cell phone, work phone, and home phone, and that she would 
receive four to five of these threatening phone calls per day.  During the 
period of March 6, 2002 through May 2002, Lee received approximately 150 phone 
calls from Gowans.  Lee also testified that she received a call from Gowans 
in the early morning hours of March 7, 2002, and that Gowans left a message on 
her answering machine.  Also according to Lee, she and Davis were living 
together at the time of the alleged offense, and she would have remembered if he 
had been out late at night at that time; however, she did not have such a 
memory.  Finally, Lee testified that she had known Davis for several years 
and never knew him to own a handgun and had never seen him with a handgun.
        Gowans 
admitted on cross-examination by the defense that she called Davis several times 
on the day of the shooting and several times in the hours following the 
shooting.  However, she denied placing a phone call to Davis’s home at 
1:26 a.m., just prior to the shooting, despite the fact that her cellular phone 
records indicated that such a call had been placed.  Gowans also admitted 
to having regular contact with Davis in the months following the shooting 
despite her testimony that she was afraid of him, including being alone with him 
in a motel room in December 2002.  During Gowans’s testimony, Davis’s 
counsel approached the bench and sought permission to ask Gowans about her 
telephone calls to Davis in an effort to show that her allegations that Davis 
shot at her were actually part of her plan of threatening and stalking conduct 
towards him.  The trial court recessed the jury and permitted Davis to 
develop the record.
        After 
questioning Gowans outside the presence of the jury about a number of the phone 
calls reflected within telephone records and securing Gowans’s admission that 
she had placed a number of the telephone calls in question, Davis played the 
tape to the court. Davis offered the tape pursuant to Texas Rule of Evidence 404 
to show Gowans’s harassment of Smith and his girlfriend and her motive, 
preparation, and plan to frame Davis for the shooting.  In response to the 
first portion of the tape Davis played, Gowans testified she could not 
understand what was contained on the tape, much less identify whether the voice 
on the tape was her own.  Regarding the next portion of the tape, Gowans 
could not identify whether the tape contained her talking to someone or someone 
talking to her.  When Davis played the third portion of the tape, Gowans 
admitted that it contained her voice asking Davis to call her; however, Gowans 
asserted that she thought she had made that phone call in January 2003.  
When told that the tape had been in the possession of the State and Davis before 
October of 2002, Gowans testified that she could not identify the time frame she 
had left that third message.
        The 
fourth portion of the tape contained a song. Gowans testified she did not know 
who had sung the song or whether she had been the one who had caused the song to 
be recorded on the answering machine.  When Davis played the next portion 
of the tape, Gowans admitted that it was her voice.  While Gowans expressed 
some uncertainly regarding when she had placed the call, she thought she had 
left the message on November 20, 2002.  Gowans admitted not only that the 
next portion of the tape contained her voice but also that she had directed her 
comments about a person being “one sorry bitch” to Davis. While Gowans “guess[ed]” 
that she had left that message after the night of the crime, she also stated 
that she could not remember when she had left the message.  Concerning the 
next message, Gowans admitted that the voice was hers, but that she did not know 
exactly when she had made the phone call and left the message. Gowans did 
assert, however, that the message had to have been left after the time the crime 
had been committed. When asked about the final message, Gowans admitted that the 
voice on the tape was hers and that her comments were directed towards 
Davis.  Regarding the timing of when she had made the telephone call, 
however, Gowans expressed confusion as to whether the message had been made 
around the time that Davis had committed his later misdemeanor assault of her or 
around the time he had committed the instant offense.  Ultimately, though, 
Gowans stated that she did not know the date she had made the telephone call.
        Gowans 
also admitted that the tape contained her voice, a threat to Patricia Lee, and a 
statement that Davis was “going to jail.”
        Davis’s 
counsel argued that the entire tape should come in as impeachment evidence and 
to show Gowans’s motive in trying to frame Davis for the alleged assault.[3]  Davis’s counsel never tried to admit only a 
portion of the tape into evidence.  The trial court refused to admit the 
tape based on grounds of relevance and “that the predicate has not even been 
made on it.”  When the trial court indicated that the tape would be not 
admitted into evidence, Davis’s counsel stated on the record, “We reserve 
the right to try and bring it in through another witness.” However, Davis did 
not move to introduce the tape — or even a limited portion thereof — during 
the testimony of his other witness with knowledge of the tape, Patricia Lee.
V. Exlcusion of the Audio Tape
        In 
his first point, Davis asserts that the trial court abused its discretion in 
finding that the cassette tape was not relevant under Texas Rule of Evidence 
401.
        A. Standard of Review
        The 
decision to exclude evidence is reviewed under an abuse of discretion standard. See 
Chambers v. State, 866 S.W.2d 9, 26-27 (Tex. Crim. App. 1993), cert. 
denied, 511 U.S. 1100 (1994). A trial court’s ruling constitutes an abuse 
of discretion when made without reference to any guiding rules or principles, so 
as to render the conclusion ultimately reached arbitrary, unreasonable, and 
outside the zone within which reasonable minds may differ. See Montgomery v. 
State, 810 S.W.2d 372, 380, 391 (Tex. Crim. App. 1990) (op. on reh’g). 
Great deference is given to the trial court’s decision to admit or exclude 
evidence even to the point of allowing the trial court a limited right to be 
incorrect so long as the trial court’s decision is not arbitrary and 
capricious. See Powell v. State, 898 S.W.2d 821, 826 (Tex. Crim. App. 
1994), cert. denied, 516 U.S. 991 (1995); Rogers v. State, 853 
S.W.2d 29, 32 (Tex. Crim. App. 1993). If the trial court’s decision to exclude 
evidence falls within the zone within which reasonable minds may differ, we 
refrain from disturbing the trial court’s decision on appeal. See 
Montogomery, 810 S.W.2d at 391. Additionally, determinations of relevance 
are within the trial court’s province and we will not substitute our 
perception of relevance for that of the trial court. Stern v. State, 922 
S.W.2d 282, 286 (Tex. App.—Fort Worth 1996, pet. ref’d) (citing Montgomery, 
810 S.W.2d at 391).
        B. Analysis
        While 
Davis contests the trial court’s relevance ruling, he nowhere contests the 
trial court’s alternative grounds for refusing to admit the tape, that “the 
predicate had not even been made on it.”  While the trial court’s 
predicate reference is somewhat vague, there indisputably was an inability to 
identify that all of the recordings were of Gowans’s voice, as well as an 
inability to identify whether she had left the song on the tape and its meaning, 
and whether each of the recordings that had been identifiable as her voice had 
been left before the shooting when Gowan was allegedly planning to frame Davis, 
or after the shooting.
        The 
messages on the tape that were unidentified had no relevance as to Gowans and 
her alleged nefarious motives and, left unidentified, lacked a proper predicate 
for admission.  Evidence is “relevant” if it has “any tendency to 
make the existence of any fact that is of consequence to the determination of 
the action more probable or less probable than it would be without the 
evidence.” Tex. R. Evid. 401. All relevant evidence 
is admissible unless specifically prohibited by Constitution, statute, or rule. Tex. R. Evid. 402. Further, Rule 404 
specifically provides that evidence of extraneous wrongs or acts may be 
admissible to show a person’s motive, preparation, and plan.  Tex. R. Evid. 404(b).  However, 
because Davis was offering the entire tape and since the record shows that 
certain portions of it were not connected to Gowans, the trial court committed 
no error in refusing to admit the entire tape into evidence. See, e.g., 
Garcia v. State, 887 S.W.2d 862, 874 n.6 (Tex. Crim. App. 1994), cert. 
denied, 514 U.S. 1021 (1995) (holding a letter containing admissable and 
inadmissable (hearsay) evidence could be held properly excluded), overruled 
on other grounds by Hammock v. State, 46 S.W.3d 889 (Tex. Crim. App. 2001); Jones 
v. State, 843 S.W.2d 487, 491 (Tex. Crim. App. 1992) (regarding an exhibit 
containing both admissible and inadmissible evidence, a trial court may 
“safely admit it all or exclude it all, and the losing party, no matter who he 
is, will be made to suffer on appeal the consequences of his insufficiently 
specific offer or objection”), cert. denied, 507 U.S. 1035 (1993), overruled 
on other grounds by Maxwell v. State, 48 S.W.3d 196 (Tex. 
Crim. App. 2001).[4]
        Further, 
the trial court’s evidentiary ruling not admitting the tape is a ruling that 
will be upheld on any theory of law that is applicable to the case, including 
that the “predicate had not been made on it.” See, e.g., Prystash v. 
State, 3 S.W.3d 522, 527 (Tex. Crim. App. 1999), cert. denied, 529 
U.S. 1102 (2000); Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim App. 
1990). Indeed, we have held that “if the ruling was correct on any theory of 
law applicable to the case, in light of what was before the trial court at the 
time the ruling was made, then we must uphold the judgment. .” Sauceda v. 
State, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).
        In 
sum, since the trial court refused to admit the tape only after having heard 
Gowans’s testimony about the different messages contained thereon, which were 
not all from Gowans, were not at identified times, and were not all concerning 
an alleged plot to frame Davis, the trial court cannot be deemed to have abused 
its discretion by acting arbitrarily or capriciously without reference to any 
guiding rules or principles in refusing to admit the entire tape when offered. See 
Montgomery, 810 S.W.2d at 380, 391.
        C. Harm Analysis
        In 
any event, we conclude that any error committed by the trial court in failing to 
admit the tape was harmless error. The trial court’s exclusion of defensive 
evidence merits review under the standard for constitutional error only if the 
exclusion effectively precludes the defendant from presenting a defense. See 
Potier v. State, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). “Exclusions of 
evidence are unconstitutional only if they ‘significantly undermine 
fundamental elements of an accused’s defense.’” Id. at 666 (quoting 
United States v. Scheffer, 523 U.S. 303, 118 S. Ct. 1261, (1998). If the 
erroneously excluded evidence was relevant to the defensive theory, but its 
exclusion did not prevent Davis from presenting a defense, the proper harm 
analysis standard is the test used for non-constitutional error embodied by both 
Texas Rule of Evidence 103(a) and Texas Rule of Appellate Procedure 44.2(b). See 
id. Despite the trial court’s complained-of ruling, Davis was still able 
to present his defensive theory, through the testimony of Patricia Lee and the 
testimony elicited during his cross-examination of Gowans, that sought to show 
that Gowans had been an obsessed woman who had fabricated the evidence of the 
shooting. Therefore, the harm analysis at hand is of the non-constitutional type 
that Davis concedes is proper. That is, it is the “substantial right” harm 
analysis under Rule 103(a) and Rule 44.2(b). Tex. R. Evid. 103(a) (“Error may not 
be predicated upon a ruling which admits or excludes evidence unless a 
substantial right of the party is affected”); Tex. R. App. P. 44.2(b) (“Any . . . 
error . . . that does not affect substantial rights must be disregarded.”).
        A 
substantial right is affected when the error had a substantial and injurious 
effect or influence in determining the jury’s verdict. King v. State, 
953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States, 
328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)); Coggeshall v. State, 961 
S.W.2d 639, 643 (Tex. App.—Fort Worth 1998, pet. ref’d). In making this 
determination, we review the record as a whole. See Johnson v. State, 967 
S.W.2d 410, 417 (Tex. Crim. App. 1998). Because we have determined that Davis 
was able to present to the jury his defensive theory of being framed by Gowans, 
we hold that any alleged error in failure to admit the tape did not have a 
substantial and injurious effect or influence in determining the jury’s 
verdict. Accordingly, if any error was committed in the failure to admit the 
tape, it was harmless error. Therefore, Davis’s first point is overruled.
VI. Charge of the Court
        In 
his second point, Davis contends the trial court erred by including in the jury 
charge language to the effect that proof beyond a reasonable doubt is not proof 
beyond all possible doubt. The State responds, and Davis concedes, that this 
court has previously ruled on this issue and found the instruction not to be 
improper. Davis requests, however, that the court reconsider the issue. We 
decline to do so.
        The 
trial court included the following in its charge to the jury regarding the 
burden of proof:
   
It is not required that the prosecution prove guilt beyond all possible doubt; 
it is required that the prosecution’s proof excludes all “reasonable 
doubt” concerning the Defendant’s guilt.
  

        As 
both Davis and the State acknowledge, this court has addressed the propriety of 
such an instruction on numerous occasions and found it not to be improper.  
See, e.g., Best v. State, 118 S.W.3d 857, 865 (Tex. App.—Fort Worth 
2003, no pet.).  Accordingly, we hold that the instruction given was not 
improper. Davis’s second point is overruled.
VII. Conclusion
        Having 
overruled all Davis’s points, the judgment of the trial court is affirmed.
  
 
                                                                  BOB 
MCCOY
                                                                  JUSTICE
 
  
PANEL 
A:   CAYCE, C.J.; LIVINGSTON and MCCOY, JJ.
 
DO 
NOT PUBLISH
Tex. R. App. P. 47.2(b)
 
DELIVERED: 
May 12, 2005

 
NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
Gowans explained that even though she had used the term “F-ing,” that Davis 
had used another word that meant “sleeping with.”
3.  
Davis’s defensive theory of a frame-up would have required the jurors to have 
believed that Gowans had conspired with Smith to take the following actions: (1) 
have her car shot with bullets; (2) position the car on Avenue J; (3) have Smith 
make a false call to 911 reporting the crime; (4) claim that the same type of 
automobile — with which Davis just happened to appear in a photograph — had 
been the car from which the shots had fired; (5) have Smith — rather than 
claim that he could identify the shooter — testify that he could not identify 
the assailant of Gowans. Further, this theory would have required the jurors to 
believe the following: (6) that both Gowans and Smith had the foresight and 
cunning to act as if they had not noticed the gunshot holes in Gowans’s 
clothing on the offhand chance that the investigating officers would somehow be 
the ones to notice the holes in Gowans’s clothing; (7) that Gowans’s scheme 
had included her ability to act so as to convince Officier Ray that she actually 
had been unaware of the gunshot holes and that her realization thereof had 
actually made her even more upset about what had happened; and (8) that she 
still called Davis after the crime and though afraid of him, stayed alone with 
Davis in a motel room later in 2002.
4.  
Maxwell abrogated Jones on the issue of being able to impeach a 
witness with his status as someone who was serving deferred adjudication 
probation.  See Maxwell, 48 S.W.3d at 199-200.